# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

SARISSA CAPITAL DOMESTIC    :
FUND LP, SARISSA OFFSHORE    :
MASTER FUND LP, SARISSA    :
CAPITAL FUND GP LLC, SARISSA    :
CAPITAL FUND GP LP, SARISSA    :
CAPITAL OFFSHORE FUND    :
LP LLC, SARISSA CAPITAL    :
MANAGEMENT GP LLC, SARISSA    :
CAPITAL MANAGEMENT LP,    :
    :
           Plaintiffs,    :
    :
        v.    :      **C.A. No. 2017-0309-JRS**
    :
INNOVIVA, INC.,    :
    :
           Defendant.    :

## MEMORANDUM OPINION

Date Submitted: September 8, 2017
Date Decided: December 8, 2017

Stephen E. Jenkins, Esquire, Richard D. Heins, Esquire and Peter H. Kyle, Esquire of ASHBY & GEDDES, Wilmington, Delaware, and Martin L. Seidel, Esquire and Sameer Advani, Esquire of WILLKIE FARR & GALLAGHER LLP, New York, New York, Attorneys for Plaintiffs.

Robert S. Saunders, Esquire, Sarah Runnells Martin, Esquire, Alyssa S. O'Connell, Esquire and Matthew P. Majarian, Esquire of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, Attorneys for Defendant.

**SLIGHTS, Vice Chancellor**

Dissident shareholders of defendant, Innoviva, Inc. ("Innoviva"), mounted a proxy contest earlier this year to elect their director nominees to Innoviva's board of directors ("Board"). This action, arising amid the aftermath, concerns the *de jure* composition of Innoviva's Board.

The dissident shareholders are plaintiffs, Sarissa Capital Domestic Fund LP, Sarissa Offshore Master Fund LP, Sarissa Capital Fund GP LLC, Sarissa Capital Fund GP LP, Sarissa Capital Offshore Fund LP LLC, Sarissa Capital Management GP LLC and Sarissa Capital Management LP (collectively, "Sarissa"). In anticipation of Innoviva's 2017 annual stockholder meeting on April 20, 2017, Sarissa launched a proxy contest to elect three director nominees to Innoviva's seven-member Board: George W. Bickerstaff III ("Bickerstaff"), Jules Haimovitz ("Haimovitz") and Odysseas Kostas ("Kostas").

Sarissa's proxy contest commenced in February 2017. In its proxy materials, Sarissa charged that Innoviva's incumbent directors were "grossly overpaid . . . in the face of poor stock performance" and were "failing to fulfill [their] duty of oversight."[1] Thus, Sarissa reckoned, Innoviva was "not be[ing] run for the benefit

---

[1] JX 36 (Innoviva, Inc., Definitive Additional Materials (Form DFAN14A), filed Mar. 30, 2017) ("Sarissa Form DFAN14A") at 21, 45.

of shareholders[.]"[2]   These themes continued with various degrees of intensity throughout Sarissa's proxy campaign.

In early April 2017, three leading proxy advisory firms recommended that Innoviva stockholders vote for Sarissa's director nominees.  Following the issuance of those recommendations, the parties began exploring a potential settlement of the proxy contest.  The chief negotiators during these discussions were Sarissa's founder and Chief Investment Officer, Alexander Denner ("Denner"), and the then-Vice Chairman of Innoviva's Board, James Tyree ("Tyree").

Two days out from the annual meeting, the proxy solicitors in both camps reported that the vote was too close to call.  This uncertainty drove the parties to intensify their settlement discussions.  Denner and Tyree reconnected and spoke on the phone several times that day.  During those calls, Denner offered that Sarissa would end its proxy campaign if Innoviva would (1) expand its Board from seven members to nine members; (2) appoint two of Sarissa's nominees to the Board as directors; *and* (3) forgo a "standstill."[3]  In response, Tyree indicated that Innoviva

---

[2] JX 36 (Sarissa Form DFAN14A) at 45.

[3] In a proxy contest settlement agreement, a "standstill" provision typically provides that, for a fixed period of time, the dissident stockholder may not (1) acquire more than a certain percentage of the corporation's outstanding voting stock; (2) engage in the solicitation of voting proxies; or (3) make any tender offer or merger proposal in respect of the corporation or its shareholders. *See, e.g.*, JX 4.1 (Yahoo! Inc., Current Report (Form 8-K), filed on Apr. 27, 2016) ("Yahoo-Starboard Settlement Agreement") at 18–21 (standstill provision in Yahoo-Starboard Settlement Agreement).

would be willing to expand its Board from seven to nine members, and to appoint two of Sarissa's nominees to the Board as directors, but insisted that Sarissa agree to a standstill and the issuance of a conciliatory joint press release announcing the settlement.

Later that day, Tyree provided an update to the Board regarding the settlement discussions. The key area of disagreement at that point was the standstill—from both parties' perspectives, that term was a "deal breaker."

The Board reconvened the next morning and held a series of telephonic meetings regarding the status of the proxy contest and settlement discussions with Sarissa.[4] With less than twenty-four hours to go before the vote, the outcome of the proxy contest still remained in doubt, as several of Innoviva's largest shareholders—including The Vanguard Group, Inc. ("Vanguard") and BlackRock, Inc. ("BlackRock")—had not yet indicated how they would vote at the annual meeting. At this point, "[t]he two assumptions [Innoviva's Board] had . . . on the big votes [then] outstanding were that [the Board's nominees] had a higher probability of

---

[4] Stipulated Joint Pretrial Order ("PTO") ¶ 90 (July 25, 2017) ("Beginning at approximately 9:30 a.m. ET on April 19, 2017, the Innoviva Board held a series of telephonic meetings that continued into the early afternoon and concluded at 1:47 p.m."). The Board minutes submitted by Innoviva indicate that this "series of telephonic meetings" was, in fact, a single Board meeting, conducted over a series of phone calls. *See* JX 189. Ultimately, the outcome of this case does not turn on whether those calls constituted a series of Board meetings or a single Board meeting. For purposes of this opinion, therefore, I adopt the "series of telephonic meetings" characterization set forth in the parties' pretrial stipulation. PTO ¶ 90.

winning the Vanguard vote and . . . a lower probability of winning the BlackRock vote."[5]

After discussing Innoviva's options, the Board remained adamant that an Innoviva-Sarissa settlement would require a standstill. Innoviva's position changed, however, once it learned—shortly after noon that day—that Vanguard planned to vote for Sarissa's nominees. Having lost Vanguard's vote, Innoviva's Board expected that it would lose BlackRock's vote as well, thereby ensuring that "at least two of Sarissa's three [nominees] would be elected to the Board . . . ."[6] The Board expected that the key shareholder votes, including BlackRock's vote, would be known for sure by the "end of the day" on April 19—between 4:00 PM and 5:00 PM.[7] Thus, following Vanguard's indication that it would be voting for Sarissa's nominees, the "clock was ticking down"[8] for Innoviva to reach a settlement with Sarissa and thereby avert an (expected) electoral defeat.

---

[5] Trial Transcript ("TT") 215:17–21 (Aguiar).

[6] JX 189 (Minutes of Innoviva Board Meeting(s) on April 19, 2017 from 9:30 AM (ET) to 1:47 PM (ET)) ("April 19 Minutes: Morning-Afternoon") at 5. Unless otherwise specified, all times in this opinion are in Eastern Time (ET).

[7] JX 412 (Grossman Dep.) at 65:21 (July 10, 2017); JX 414 (Aguiar Dep.) at 79:17–80:6 (July 12, 2017); *see* JX 189 (April 19 Minutes: Morning-Afternoon) at 5.

[8] TT 234:21 (Aguiar).

4

The Board reconvened later that afternoon for another telephonic meeting. During that meeting, the Board determined that: (1) Innoviva would settle with Sarissa without a standstill; (2) as part of that settlement, Innoviva would expand its Board from seven to nine members and appoint any two of Sarissa's three nominees to the expanded Innoviva Board; *and* (3) the settlement would require Sarissa to include a conciliatory quote about Innoviva in a joint press announcing the settlement. At the meeting's close, the Board authorized Tyree to convey to Denner that Innoviva would settle with Sarissa on those terms.

Tyree phoned Denner shortly thereafter to convey Innoviva's revised settlement proposal. Denner promptly accepted, and so confirmed Sarissa's assent to the essential terms of a Sarissa-Innoviva settlement. At the end of their call, Tyree and Denner confirmed they "had a deal"[9] and that they would leave it to others on their respective teams to prepare the "paperwork . . . to get it done."[10] Neither Tyree nor Denner indicated, however, that the settlement was contingent upon the execution of the "paperwork."

Following Tyree and Denner's call, the parties' attorneys worked to memorialize the agreed-upon deal in writing and finalize the language

---

[9] JX 421 (Tyree Dep.) at 89:17 (July 20, 2017) ("I told Alex Denner that we had a deal . . . ."); TT 44:18–20 (Denner) ("Q: Did the two of you say, 'We've got a deal'? A: Yes.").

[10] JX 421 (Tyree Dep.) at 69:21; TT 46:6–8 (Denner) (same).

5

of the parties' joint press release. With the confirmatory writing finalized, and the press release nearly finalized, Innoviva learned that BlackRock had voted in favor of the Board's slate of directors, effectively ensuring that the Board's nominees would win election. Having snatched victory from the jaws of defeat, Innoviva's Board changed course. It resolved to cease discussions with Sarissa and proceed with the stockholder vote at Innoviva's annual meeting the following day. Tyree made contact with Denner that evening to advise him, in essence, that the "deal" that had been struck during their phone conversation hours before was now "no deal."

Sarissa filed this action under 8 *Del. C.* § 225 on the day of the annual meeting. It seeks a declaration that the parties entered into a binding settlement agreement the afternoon of April 19, 2017—during the Denner/Tyree telephone call. According to Sarissa, during that call, Tyree orally bound Innoviva to a settlement agreement with the following terms:

1. Innoviva would expand its Board from seven members to nine, and two of Sarissa's nominees would be added as directors, without requiring a standstill;

2. Sarissa would terminate its proxy contest, withdraw its nomination notice and dismiss its then-pending books-and-records action against Innoviva;

3. Sarissa and Innoviva would announce the settlement in a mutually conciliatory joint press release; *and*

4. Innoviva would issue new proxy materials with the two Sarissa nominees included on the Board's slate, and Innoviva's 2017 annual meeting would be adjourned (for no more than thirty days) so that those new materials could be prepared and issued.

6

Sarissa also asks the Court to "specifically enforce the terms of the parties' agreement and order Innoviva and its directors and management to expand the size of the [Board] to nine and appoint [Kostas and Bickerstaff] to the Board."[11]

Innoviva, for its part, argues that the parties never entered into a binding settlement agreement. In this regard, Innoviva contends that—

1. The parties never reached a meeting of the minds on all material terms of a settlement;

2. The parties did not intend to enter into a binding oral contract, but instead understood that any contract would have to be memorialized in an executed written agreement; *and*

3. Tyree lacked authority to bind Innoviva to the alleged oral contract.

In this post-trial opinion, I conclude that Tyree had actual and apparent authority to bind Innoviva to an oral settlement agreement with Sarissa when he telephoned Denner the afternoon of April 19, 2017. I also find that Sarissa and Innoviva entered a binding oral settlement contract during that call in accordance with the terms agreed to by Denner and Tyree. Finally, I am satisfied that the facts and circumstances of this case warrant specific enforcement of that contract. My reasoning follows.

---

[11] Amended Verified Complaint ("Am. Compl.") 27 (May 12, 2017).

# I. BACKGROUND

I recite the facts as I find them based on the evidence presented during a one-day trial on July 27, 2017. That evidence comprises testimony from nine fact witnesses (some presented live and some by deposition) and over 400 exhibits. I accord the evidence the weight and credibility I find it deserves.

## A. Parties and Relevant Non-Parties

Sarissa is a stockholder of record of 1,000 shares of Innoviva common stock.[12] Sarissa also beneficially owns 3.4 million shares of Innoviva common stock in the aggregate—or approximately 3.14% of Innoviva's outstanding common stock (as of February 24, 2017).[13]

Innoviva is a Delaware corporation headquartered in Brisbane, California.[14] Its primary business is collecting royalties on certain drugs it has licensed to GlaxoSmithKline ("GSK").[15] During the Sarissa proxy contest, Innoviva's Board comprised seven members: (1) Michael Aguiar ("Aguiar"), Innoviva's CEO;

---

[12] PTO ¶ 60.

[13] PTO ¶ 61. February 24, 2017 was the record date for Innoviva's 2017 annual stockholder meeting. JX 26 (Innoviva, Inc., Definitive Proxy Statement (Form DEF 14A), filed Mar. 21, 2017) ("Innoviva Proxy Statement") at 3.

[14] PTO ¶ 59.

[15] TT 149:19–150:15 (Friedman); TT 188:6–17 (Aguiar). GSK is Innoviva's largest stockholder; as of February 24, 2017, it held 29.3% of Innoviva's common stock. PTO ¶ 79.

(2) William Waltrip ("Waltrip"), who was then Chairman of the Board; (3) Tyree, who was then Vice Chairman of the Board;[16] (4) Barbara Duncan ("Duncan"); (5) Cathy Friedman ("Friedman"); (6) Patrick LePore ("LePore"); and (7) Paul Pepe ("Pepe").[17]

Non-party Denner, Sarissa's founder and CIO, was Sarissa's lead negotiator during its proxy contest.[18] Non-party Mark DiPaolo ("DiPaolo") is Sarissa's general counsel and was the lead attorney representing Sarissa during the negotiations of the alleged settlement agreement.[19] Non-party Richard Grossman is a partner at Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") and was the lead attorney representing Innoviva in connection with the Sarissa proxy contest and during the settlement negotiations.[20]

---

[16] Tyree resigned from Innoviva's Board in June 2017. JX 421 (Tyree Dep.) at 90:13–14. As discussed below, Innoviva's abrupt decision to deny that it had reached a settlement with Sarissa was a key factor in Tyree's resignation decision. JX 421 (Tyree Dep.) at 89:14–91:11.

[17] PTO ¶ 70. The members of Innoviva's Board during Sarissa's proxy contest are not parties to this action. *See* Am. Compl., pmbl.

[18] PTO ¶¶ 62, 81, 84; TT 21:16–18 (Denner).

[19] PTO ¶ 63.

[20] PTO ¶ 72. In addition, each party retained a proxy solicitor during the proxy contest. PTO ¶¶ 69, 73. Non-party D.F. King & Co., Inc. ("D.F. King") was Sarissa's proxy solicitor, and non-party Innisfree M&A Inc. ("Innisfree") was Innoviva's proxy solicitor. PTO ¶¶ 69, 73. Innoviva also retained a financial advisor, non-party Evercore Partners Inc. ("Evercore"), and a public relations advisor, non-party Abernathy MacGregor Group, Inc. ("Abernathy MacGregor"), in connection with the proxy contest. PTO ¶¶ 74, 75.

9

## B. Sarissa Launches a Proxy Contest

Innoviva's 2017 annual stockholder meeting (the "Annual Meeting") was scheduled for April 20, 2017.[21] In February 2017, Sarissa launched a proxy contest in connection with the Annual Meeting, with the goal of electing three Sarissa nominees to Innoviva's seven-member Board.[22] Sarissa's three nominees were Bickerstaff, Haimovitz and Kostas.[23] Sarissa also commenced a concomitant action under 8 *Del. C.* § 220 seeking certain corporate books and records to assist in its prosecution of the proxy contest.[24]

Throughout its proxy campaign, Sarissa was sharply critical of Innoviva's incumbent directors. In its proxy materials, Sarissa inveighed that Innoviva's incumbent directorship was "grossly overpaid . . . in the face of poor stock performance" and was "failing to fulfill its duty of oversight."[25] According to Sarissa, Innoviva was "handicapped by poor governance" and was "not be[ing] run

---

[21] PTO ¶ 64.

[22] PTO ¶ 65. Sarissa's three nominees, if elected, would replace incumbent Innoviva directors Aguiar, Waltrip and Pepe. *Id.*

[23] *Id.*

[24] *See* Verified Compl. Pursuant to 8 *Del. C.* § 220, *Sarissa Capital Domestic Fund LP v. Innoviva, Inc.*, C.A. No. 2017-0216-JRS (Del. Ch. Mar. 21, 2017). The Court has stayed Sarissa's Section 220 action pending the resolution of this case. D.I. 101 at 41:13–14.

[25] JX 36 (Sarissa Form DFAN14A) at 21, 45.

for the benefit of shareholders."[26] These charges fed into Sarissa's campaign slogan: "stockholder representation for the benefit of all stockholders."[27]

## C. Sarissa and Innoviva Explore a Possible Settlement of the Proxy Contest

In the first week of April 2017, two leading proxy advisory firms, Glass, Lewis & Co. ("Glass Lewis") and Institutional Shareholder Services Inc. ("ISS"), issued reports recommending that Innoviva stockholders vote for Sarissa's nominees.[28] Glass Lewis's report, issued on April 6, recommended that Innoviva stockholders vote for Bickerstaff and Kostas.[29] ISS's report, issued on April 7, recommended that Innoviva stockholders vote for all three of Sarissa's nominees.[30]

The publication of these two reports changed the tenor of Innoviva's internal Board discussions, since it now appeared that Sarissa's nominees realistically could win election.[31] Indeed, the prospect of a Sarissa victory in the proxy contest "motivate[d] the Board to more actively consider what a settlement [with Sarissa]

---

[26] *Id.* at 45.

[27] *Id.*

[28] PTO ¶¶ 76–78; JX 98 at 2–3 (excerpt of Glass Lewis report); JX 101.1 at 3–4 (excerpt of ISS report).

[29] JX 98 at 2–3 (excerpt of Glass Lewis report).

[30] JX 101 at 3–4 (excerpt of ISS report).

[31] JX 421 (Tyree Dep.) at 23:21–24:24, 26:3–10.

could look like."[32]  As Tyree testified, "a possible settlement [with Sarissa now] became much more of an open topic" for Board consideration. [33]

It was under these circumstances that Denner and Tyree first began discussing what it would take to resolve Sarissa's proxy contest.[34]  Tyree and Denner had initially connected in late March 2017, when Denner placed "an unannounced telephone call . . . directly to [Tyree]"[35] at his office—the two never having met before.[36]  Tyree "did not accept [Denner's] telephone call initially but [after] discuss[ing] it with other [Innoviva] Board members and counsel . . . decided [to] return the . . . call."[37]  Thereafter, the Board appointed Tyree to serve as Innoviva's "primary point person in discussi[ons] with [Denner]."[38]

Following the publication of the Glass Lewis and ISS reports, Tyree emailed Denner on April 9 that it was "probably time to talk" about a potential Sarissa-

---

[32] *Id.* at 26:9–10.

[33] *Id.* at 24:16–17.

[34] *Id.* at 18:24–19:6; TT 29:2–30:1 (Denner).

[35] JX 421 (Tyree Dep.) at 14:6–7.

[36] *Id.* at 13:21–14:5.

[37] *Id.* at 16:5–8.

[38] *Id.* at 14:12–13; TT 171:7–9 (Friedman) ("Q: But [Tyree] was the lead negotiator [Innoviva's] [B]oard appointed. Right?  A: That is correct.").

Innoviva settlement—and the terms upon which a settlement might be reached.[39]

Innoviva's Board felt even more pressure to explore settlement on April 11, when Egan-Jones Proxy Services joined ISS in recommending that Innoviva stockholders vote for all of Sarissa's nominees.[40] Two days later, however, Innoviva received a boost when its largest shareholder, GSK, announced that it intended to vote for the Board's slate.[41]

## D. Sarissa-Innoviva Settlement Discussions Commence in Earnest

On April 18, 2017, two days out from the Annual Meeting, the outcome of Sarissa's proxy contest remained an open question.[42] While both parties' voting tabulations had the Board's slate leading, that lead was attributable solely to GSK's vote.[43] Both parties appreciated that their tabulations were missing key data points.[44]

---

[39] JX 102 at 1; JX 421 (Tyree Dep.) at 25:17–26:14.

[40] JX 104 at 2–4 (excerpt of Egan-Jones report).

[41] JX 54 (Innoviva, Inc., Definitive Additional Materials (Form DEFA14A), filed Apr. 14, 2017) at 3 (excerpt of GSK Schedule 13D Amendment No. 6, filed Apr. 13, 2017). GSK also actively assisted Innoviva's management in soliciting proxies from other large Innoviva stockholders. *See, e.g.*, JX 111; JX 113.

[42] *See, e.g.*, JX 113; JX 142 (Minutes of April 18, 2017 Innoviva Board Meeting) ("April 18 Minutes") at 2.

[43] *See* JX 143 at 2–25; JX 148 at 1–9; JX 142 (April 18 Minutes) at 2.

[44] *See, e.g.*, JX 137 at 2–5 (vote tally prepared by D.F. King on April 18, 2017 at 10:59 AM); JX 139 at 2–4 (vote tally prepared by Innisfree on April 18, 2017 at 11:54 AM).

Specifically, as of April 18, several of Innoviva's largest shareholders—including Vanguard, BlackRock and The Baupost Group, LLC ("Baupost")—had not yet voted or announced how they would be voting.[45] The Board had reason to believe, however, that Baupost would vote for Sarissa's nominees.[46] And then there were the Glass Lewis, ISS and Egan-Jones recommendations to consider, as well.[47] At this juncture, Sarissa and Innoviva began to discuss a potential settlement in earnest.

Denner and Tyree spoke on the phone "several times" on April 18 regarding a potential Sarissa-Innoviva settlement.[48] During those calls, Sarissa's settlement "bid" (conveyed by Denner) was "two directors, no standstill;"[49] Innoviva's settlement "ask" (conveyed by Tyree) was "two directors, a standstill, and [a press release in which Sarissa would] say something nice about [Innoviva]."[50]

---

[45] *See, e.g.*, JX 143 at 2–25 (vote tally and "top [share]holders tracker summary" prepared by Innisfree on April 18, 2017 at 4:53 PM); JX 148 at 1–9 (vote tally and institutional investor voting report prepared by D.F. King on April 18, 2017 at 6:29 PM).

[46] *See, e.g.*, JX 139 at 6; JX 143 at 5–7.

[47] *See, e.g.*, JX 421 (Tyree Dep.) at 23:21–26:14.

[48] TT 31:3–8 (Denner); JX 421 (Tyree Dep.) at 33:13–34:6, 53:1–22.

[49] JX 421 (Tyree Dep.) at 34:4; TT 31:14–32:6 (Denner).

[50] JX 421 (Tyree Dep.) at 34:5–6; TT 31:14–32:6, 37:7–38:6 (Denner).

Eventually, Tyree asked Denner to put Sarissa's position into writing so that Tyree could show it to Innoviva's Board.[51]

At 6:31 PM that evening, Denner forwarded the following email (drafted by Sarissa's general counsel, DiPaolo) to Tyree:

> The [B]oard would today resolve to increase its size by two and immediately add George Bickerstaff and Jules Haimovitz to the [B]oard and would also resolve today to add these two directors to the slate for the 2017 [Annual] [M]eeting. The [B]oard would then send out new proxy materials with the reconstituted slate. Sarissa would agree to withdraw its nomination notice and not nominate anyone at the meeting. Sarissa would also agree to drop its 220 request. All of this would be announced by the company in a press release today and an 8-K filing tomorrow. Sarissa would also announce this in a press release today and an SEC filing tomorrow. This may require a short adjournment. [Grossman] and I should exchange emails confirming both sides have agreed to do this.[52]

Innoviva's Board convened later that evening, at 7:30 PM, for a telephonic meeting.[53] During that meeting, Tyree updated the Board on his conversations with

---

[51] TT 32:7–13 (Denner); JX 423 (Denner Dep.) at 81:13–16 (July 24, 2017); *see* JX 421 (Tyree Dep.) at 41:19–25, 45:3–18; JX 149.

[52] JX 149 ("April 18 Sarissa Settlement Proposal E-Mail"). Under Innoviva's bylaws, Board approval (by majority resolution) is required to expand the size of the Board. JX 8 (Innoviva, Inc., Current Report (Form 8-K), filed Feb. 9, 2017), Ex. 3.1 (Amended and Restated Bylaws of Innoviva, Inc. (as of Feb. 8, 2017)) ("Innoviva Bylaws") § 3.2. And Board vacancies (or new Board seats) may only be filled by a "majority vote of directors then in office." Innoviva Bylaws § 3.9.

[53] JX 142 (April 18 Minutes) at 1.

15

Denner regarding a possible settlement of the proxy contest.[54] After discussion, the Board directed Grossman (of Skadden) "to prepare and deliver a draft settlement agreement to Sarissa's general counsel [DiPaolo] for discussion purposes[.]"[55] That draft agreement was to provide, among other things:

- "for [Innoviva] to increase the size of the Board by two seats to nine";[56]

- "[for Innoviva] to appoint [Bickerstaff] and [Haimovitz] to the Board";[57]

- "[for] Sarissa to dismiss its [Section] 220 action";[58] and

- "[for] Sarissa to agree to customary standstill and non-disparagement provisions through the advance notice deadline for the 2018 annual meeting of stockholders, with such . . . provisions to be extended for an additional year if Messrs. Bickerstaff and Haimovitz were re-nominated for election as directors at the 2018 annual meeting."[59]

---

[54] *Id.* at 2. It is unclear, however, whether the Board discussed Denner's 6:31 PM email during its April 18, 2017 evening meeting. The minutes of that meeting do not specifically state that such discussion occurred, and Innoviva director Friedman testified that she had "never seen" Denner's 6:31 PM email to Tyree. JX 418 (Friedman Dep.) at 44:2–11, 45:2–12 (July 19, 2017).

[55] JX 142 (April 18 Minutes) at 3.

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.*

16

The Board then determined to reconvene the following morning "to review the status of the [settlement] discussions," and the meeting was adjourned.[60]

Grossman and DiPaolo spoke on the phone later that evening.[61] Grossman explained that "while he had no authority to make a settlement and the [B]oard hadn't even decided whether it wanted to make a settlement with [Sarissa], th[e] [Board had] instructed him to send over a draft settlement agreement that provided for [the appointment of] two [Sarissa nominees] and a standstill."[62] DiPaolo told Grossman that he could send the draft "if he wanted to," although DiPaolo personally "didn't think it was worthwhile because [Sarissa] wouldn't agree to that type of standstill."[63]

Grossman and DiPaolo also discussed the timing of a potential settlement.[64] Grossman advised DiPaolo that it would be "beneficial" if Sarissa and Innoviva could reach a settlement "before th[e] final . . . vote [tally]" came in "at the end of the day" on April 19—between 4:00 and 5:00 PM—at which time the proxy

---

[60] *Id.*

[61] TT 84:16–87:4 (DiPaolo), 257:24–258:13 (Grossman).

[62] TT 84:22–85:3 (DiPaolo), 257:24–258:13 (Grossman); JX 412 (Grossman Dep.) at 65:7–66:3.

[63] TT 86:15–17 (DiPaolo).

[64] TT 86:18–87:4 (DiPaolo), 258:14–20 (Grossman).

contest's result would be a virtual *fait accompli*.[65]  DiPaolo agreed.[66]  Both understood the practical significance of the timing issue: If there were to be a Sarissa-Innoviva settlement, it would have to be concluded before "the end of the day" on April 19.[67]

At 11:28 PM on April 18, Grossman emailed a draft settlement agreement to DiPaolo.[68]  The draft settlement agreement provided, among other things:

- that Innoviva would increase the size of the Board to nine members;

- that Innoviva would appoint two Sarissa designees to the Board (Bickerstaff and Haimovitz being the tentative appointees);

- that Sarissa would discontinue the proxy contest and dismiss its pending Section 220 action against Innoviva; *and*

- that Sarissa would agree to a one-year standstill.[69]

The draft agreement also specifically stated that the agreement would "become effective" only when "signed by each of the Parties and delivered to the other Party . . . ."[70]

---

[65] TT 258:14–20, 258:24–259:11 (Grossman); *id.* at 86:20–87:1 (DiPaolo).

[66] TT 86:18–87:1 (DiPaolo).

[67] TT 258:14–20, 258:24–259:11 (Grossman); *id.* at 86:18–87:1 (DiPaolo).

[68] JX 164 ("April 18 Skadden Draft Agreement").

[69] *Id.* §§ 1(a)–(c), 2.

[70] *Id.* § 10.

18

Appreciating that time was running out, DiPaolo sent a reply email to Grossman at 3:32 AM on April 19, 2017, in which he rejected the draft settlement agreement.[71] DiPaolo's email stated, "We are not philosophically opposed to having a very simple agreement without a standstill. Unfortunately, I don't think there is time to get this done via agreement. Our deal is very simple and shouldn't require any agreement. If the [B]oard adds two of our nominees to the [B]oard, then this will all be over tomorrow morning."[72]

## E. The Day Before the Annual Meeting

Innoviva's Board reconvened at 9:30 AM on April 19 and held a series of telephonic meetings lasting through the morning.[73] In its morning meetings, the Board discussed the status of settlement negotiations with Sarissa and the voting results to date.[74] Tyree reported that he had spoken with Denner the night before.[75] During this conversation, Tyree had reiterated to Denner the essential terms of Innoviva's settlement proposal: Innoviva would appoint two Sarissa nominees to the expanded (nine-member) Innoviva Board, subject to a standstill; and the parties

---

[71] JX 171.

[72] *Id.*

[73] PTO ¶ 90; *see* JX 189 (April 19 Minutes: Morning-Afternoon) at 1.

[74] JX 189 (April 19 Minutes: Morning-Afternoon) at 1–4.

[75] *Id.* at 3.

would announce the settlement in a conciliatory joint press release.[76] Denner, in turn, provided Sarissa's stock response: "two directors, no standstill, and [Sarissa would] work on the press announcement to make it so that [Sarissa's principals and Innoviva's Board] look like we're shaking hands and getting this [*i.e.*, the proxy contest] behind us."[77]

Following Tyree's report, the Board discussed how Innoviva might respond to Sarissa's counterproposal.[78] At the time, the stockholder vote appeared very close.[79] And Vanguard and BlackRock still had not reported how they would be voting.[80] "The two assumptions [Innoviva's Board] had . . . on the big votes [then] outstanding were that [the Board's slate] had a higher probability of winning the Vanguard vote and . . . a lower probability of winning the BlackRock vote."[81]

Working from these assumptions, the Board discussed several options available to Innoviva in connection with Sarissa's proxy contest, including (1) accepting Sarissa's counteroffer and appointing Bickerstaff and Haimovitz to the

---

[76] JX 421 (Tyree Dep.) at 53:13–22; JX 189 (April 19 Minutes: Morning-Afternoon) at 3–4.

[77] JX 421 (Tyree Dep.) at 53:20–22; TT 37:7–38:6 (Denner).

[78] JX 189 (April 19 Minutes: Morning-Afternoon) at 3.

[79] *See, e.g.*, *id.* at 4.

[80] *Id.*; TT 215:17–21 (Aguiar); JX 414 (Aguiar Dep.) at 51:7–53:3.

[81] TT 215:17–21 (Aguiar); JX 414 (Aguiar Dep.) at 52:25–53:3.

expanded (nine-member) Innoviva Board without a standstill; or (2) refusing to settle with Sarissa, and instead proceeding with the vote at Innoviva's 2017 Annual Meeting the next day.[82] After discussion, the Board remained adamant that an Innoviva-Sarissa settlement would require a standstill.[83] Thus, the Board directed that Tyree contact Denner to see if Sarissa would back off its resistance to that key deal term.[84]

Tyree reached Denner by phone as directed.[85] And, as directed, he advised Denner that Innoviva remained willing to enter into a settlement with Sarissa in which (1) Innoviva's Board would be expanded from seven to nine members; (2) two of Sarissa's nominees would be appointed to the expanded Innoviva Board; (3) the parties would announce the settlement in a conciliatory joint press release; and (4) Sarissa would be subject to a standstill.[86] Denner, in turn, reiterated that Sarissa was not willing to agree to a standstill.[87] No progress. Clock ticking.

---

[82] JX 189 (April 19 Minutes: Morning-Afternoon) at 3; *see* TT 215:17–216:4 (Aguiar).

[83] JX 189 (April 19 Minutes: Morning-Afternoon) at 4–5.

[84] *Id.* at 4.

[85] *Id.* at 4–5; JX 421 (Tyree Dep.) at 56:7–21; TT 41:22–42:16 (Denner).

[86] JX 421 (Tyree Dep.) at 53:12–24, 56:7–57:23; TT 41:22–42:16 (Denner).

[87] JX 189 (April 19 Minutes: Morning-Afternoon) at 5; JX 421 (Tyree Dep.) at 56:7–57:23; TT 41:22–42:16 (Denner).

## 1. Vanguard Advises Innoviva That It Will Be Voting for Two of Sarissa's Nominees

Shortly after noon on April 19, 2017, Aguiar spoke on the phone with Vanguard representatives, who informed him that Vanguard would be voting for two of Sarissa's director nominees.[88]  Immediately following that call, Aguiar sought to reconvene the Board for an emergency meeting.[89]  As of that morning, the Board had assumed it would win the Vanguard vote but perhaps lose the BlackRock vote.[90]  With Vanguard announcing that it would be voting for two of Sarissa's nominees, however, one those assumptions went out the window.  Accordingly, Aguiar sought "to get the [B]oard together" as soon as possible to discuss the import of Vanguard's vote with respect to the proxy contest and Innoviva's settlement discussions with Sarissa.[91]

---

[88] TT 201:1–9 (Aguiar); *see* JX 221 (e-mail from Aguiar to Innoviva Board); PTO ¶ 92.

[89] TT 211:3–216:4 (Aguiar); JX 228 (e-mail chain dated April 19, 2017, including the following emails from Aguiar to Innoviva's Board: (1) email sent at 12:12 PM, in which Aguiar advises that he "[j]ust spoke with Vanguard" and that Vanguard would be voting "for 2 of the Sarissa nominees"; (2) email sent at 12:16 PM, in which Aguiar writes, "I think we should have a call ASAP.  Can we dial in at 12:20 EDT?"); JX 229 (e-mail from Aguiar to Duncan, sent on April 19, 2017, at 12:33 PM, in which Aguiar writes, "It is urgent that you [Duncan] jump on the call.").

[90] TT 215:17–21 (Aguiar).

[91] TT 216:1–2 (Aguiar); *id.* at 211:3–215:23 (Aguiar); JX 228 (email chain among Board members).

The Board reconvened at 12:30 PM for another telephonic meeting.[92] Present for this meeting were all of Innoviva's directors except LePore, who was unavailable.[93] Also present were representatives of Innoviva's proxy solicitor (Innisfree) and financial advisor (Evercore).[94] The sole topics for discussion were how Vanguard's anticipated vote affected the proxy contest and whether, given this new information, Innoviva should approach Sarissa with a revised settlement proposal.[95] In connection with that discussion, representatives of Innisfree and Evercore advised the Board that "of the index funds, [Vanguard] tends to be the most management-friendly and, having lost [Vanguard's] vote it was highly likely that the

---

[92] JX 189 (April 19 Minutes: Morning-Afternoon) at 5.

[93] *Id.*

[94] *Id.* at 3–5; JX 414 (Aguiar Dep.) at 62:1–64:13.

[95] JX 189 (April 19 Minutes: Morning-Afternoon) at 3–5; JX 414 (Aguiar Dep.) at 51:7–25, 62:1–64:13. The minutes of the Board's April 19 meetings (from 9:30 AM to 1:47 PM) do not accurately state when Aguiar informed the Board of Vanguard's stated voting position (*i.e.*, that it would vote for two of Sarissa's nominees). *See* JX 189 (April 19 Minutes: Morning-Afternoon) at 3–4; JX 414 (Aguiar Dep.) at 51:7–25, 62:1–64:13. The minutes indicate that Aguiar informed the Board of Vanguard's intended vote before 11:00 AM on April 19. *See* JX 189 (April 19 Minutes: Morning-Afternoon) at 3. As of 11:00 AM on April 19, however, Aguiar had not yet heard from Vanguard regarding how Vanguard intended to vote. *See, e.g.*, JX 414 (Aguiar Dep.) at 51:7–25 (in which Aguiar states that he had not been informed how Vanguard would be voting prior to 12:12 PM on April 19, 2017); JX 228 (Aguiar's e-mails to the Board). Thus, Aguiar could not have informed the Board of Vanguard's anticipated vote prior to 11:00 AM on April 19. *See* JX 414 (Aguiar Dep.) at 51:7–25, 62:1–63:3; JX 228; *Schroder v. Scotten, Dillon Co.*, 299 A.2d 431, 440 (Del. Ch. 1972) ("Although the minutes of a directors' meeting are the best evidence of what took place there, [extrinsic] evidence is admissible to supplement or contradict the events as reported in the minutes.").

[Board] would also lose [BlackRock's] vote for at least two directors."[96] Tyree concurred, "not[ing] that his call with representatives of [BlackRock] had been lukewarm and [that] he agreed . . . it was unlikely that [BlackRock] would vote for the Board's nominees."[97] Tyree also informed the Board that he had spoken with Denner, who had reiterated that Sarissa would not agree to a standstill.[98] And so the Board now had to determine whether Innoviva would continue to insist on the standstill as a condition of the settlement.[99] "Following a discussion, the Board determined to recess again until 1:30 PM Eastern time when all the directors were expected to be available."[100]

After the brief recess, the Board reconvened as planned for another telephonic meeting. Aguiar opened this meeting with a bleak assessment: "Given the way that [Vanguard had] voted, and that [Innoviva] was unlikely to receive [BlackRock's] vote, there was a high probability that at least two of Sarissa's three candidates would be elected to the [seven-member] Board."[101] The Board then discussed Innoviva's

---

[96] JX 189 (April 19 Minutes: Morning-Afternoon) at 4.

[97] *Id.*

[98] *Id.* at 5.

[99] *See, e.g.*, *id.*; TT 215:17–216:4 (Aguiar).

[100] JX 189 (April 19 Minutes: Morning-Afternoon) at 5.

[101] *Id.* at 5. This, of course, meant that two of the Board's slate of nominees would lose election and be replaced.

24

options going forward, and Grossman answered the Board's questions about the terms of the draft settlement agreement and the press release.[102]

The Board next discussed Kostas' suitability (or not) as a Board appointee and reached "the consensus . . . that, based on circumstances then existing, Dr. Kostas would be acceptable as a replacement for either Mr. Haimovitz or Mr. Bickerstaff."[103] Tyree testified that this "was just a clarification around the fact that any subset of [Sarissa's three nominees] would be acceptable,"[104] given that the Board had already "vetted" each of the three.[105]

After further discussion, the Board determined that Innoviva would agree to a settlement with Sarissa—"without 'standstill' or non-disparagement provisions and with a press release favorable to [Innoviva]"[106]—whereby Innoviva's Board would be expanded from seven to nine members and two of Sarissa's three nominees would

---

[102] *Id.* at 6.

[103] *Id.* at 7.

[104] JX 421 (Tyree Dep.) at 65:3–4.

[105] JX 421 (Tyree Dep.) at 65:1–2. *See also* TT 248:19–249:8 (Aguiar) (confirming that Tyree was authorized to convey to Denner that Innoviva would accept Kostas as one of Sarissa's two Board appointees); JX 421 (Tyree Dep.) at 35:9–15 ("Q: Now, on [April] 19th was it your understanding that [Innoviva's] Board was willing to accept any two of Sarissa's three nominees? A: Yes. Q: And did you communicate that to Dr. Denner? A: Yes.").

[106] JX 189 (April 19 Minutes: Morning-Afternoon) at 7.

be appointed as directors to fill the resulting Board vacancies.[107]  In anticipation of Innoviva's entry into a settlement with Sarissa on those terms, Innoviva's Board conditionally resolved to expand the Board from seven to nine members and to fill the resultant Board vacancies with two Sarissa nominees (tentatively, Haimovitz and Bickerstaff).[108]

As the final step before the meeting broke, the Board authorized Tyree to convey Innoviva's revised proposal to Denner and "to attempt to settle with Sarissa."[109]  In that regard, Tyree was authorized to convey to Denner the following: (1) that Innoviva would settle with Sarissa without a standstill; (2) that, as part of that settlement, Innoviva would expand its Board from seven to nine members and appoint two of Sarissa's nominees to Innoviva's expanded Board as directors; *and* (3) that the settlement would require Sarissa to include a conciliatory quote about

---

[107] *Id.* at 7–8.

[108] *Id.* at 7–8.

[109] JX 384 (Tyree Aff.) ¶ 6 (Apr. 30, 2017); JX 421 (Tyree Dep.) at 64:1–9 ("Q: And what were you instructed to do [by the Board]?  A: To communicate the original two primary components of a[] [settlement] agreement, [Innoviva will] take two of [Sarissa's] directors, you [*i.e.*, Sarissa] have to say something nice about [Innoviva] and the third point which was [Innoviva] won't insist on standstill.  Q: And the Board gave you authority to make that proposal?  A: It did."); April 19 Innoviva Board Meeting Minutes at 8 ("[T]he Board authorizes and requests that Mr. Tyree contact Dr. Denner to negotiate to see if a settlement agreement including a press release between Sarissa and [Innoviva] c[an] be reached.").

Innoviva in the joint press release announcing the settlement.[110]  The meeting adjourned at 1:47 PM.[111]

At 2:02 PM, Grossman emailed DiPaolo a short draft settlement agreement and press release.[112]  The draft agreement added some detail but reflected the material settlement terms the Board had just authorized:

1. "upon the issuance of the attached press release," Sarissa agreed to withdraw its nomination notice, discontinue its proxy contest and drop its pending Section 220 action;[113] *and*

2. Innoviva agreed to (i) immediately increase the size of its Board to nine members, (ii) appoint Haimovitz and Bickerstaff as Innoviva directors, (iii) include Haimovitz and Bickerstaff "as nominees of the Board to stand for election as directors at [Innoviva's] 2017 Annual Meeting," (iv) adjourn its 2017 Annual Meeting to "not later than May 19, 2017" so that the Board could revise its slate of director nominees accordingly and (v) file revised proxy materials, which would be subject to Sarissa's review and comment.[114]

The "attached press release" stated that Sarissa and Innoviva had reached a settlement (on the above terms) and contained proposed quotes from Waltrip

---

[110] JX 421 (Tyree Dep.) at 53:21–22; *id.* at 64:1–9; JX 189 (April 19 Minutes: Morning-Afternoon) at 7–8.

[111] JX 189 (April 19 Minutes: Morning-Afternoon) at 8.

[112] JX 245 at 2–10.

[113] JX 245 at 2.

[114] JX 245 at 2–3.

27

(the Chairman of Innoviva's Board) and Denner, respectively, that Innoviva believed were conciliatory.[115]

## 2. Tyree and Denner Speak on the Phone and Reach a Deal

At approximately 2:30 PM, Tyree connected with Denner over the phone to convey the settlement proposal he had been authorized by the Board to make.[116] Since Innoviva had abandoned its demand for a standstill, Denner was quick to accept Innoviva's proposal.[117] And with that, Tyree and Denner reached agreement on the essential terms of an Innoviva-Sarissa settlement.[118]

---

[115] JX 245 at 8. The proposed Waltrip quote read: "We are pleased to have reached this agreement with Sarissa, enabling our Board and management team to focus our full attention on growing Innoviva, and continuing to return value to our investors. It is clear Sarissa, Mr. Bickerstaff and Mr. Haimovitz see the potential of Innoviva, and we respect their willingness to work collaboratively to drive sustainable shareholder value today and into the future. Our Board remains committed to delivering value to all investors." *Id.* The proposed Denner quote read: "I am happy to have reached this agreement with Innoviva and believe that George [Bickerstaff] and Jules [Haimovitz] will be strong additions to the Company's Board in the shared goal of enhancing shareholder value. Innoviva's Board has demonstrated a willingness to accept shareholder input, and as a shareholder, I look forward to future productive dialogue." *Id.*

[116] TT 43:18–44:20 (Denner); JX 421 (Tyree Dep.) at 69:12–24.

[117] JX 421 (Tyree Dep.) at 69:16–24; TT 44:6–20 (Denner).

[118] *See, e.g.*, JX 421 (Tyree Dep.) at 83:3–5 ("Q: And is it fair to say you believe that you and [Denner] agreed to all of the high level necessary terms? A: Yes."), 85:10–13 ("I had reached agreement with Alex Denner on the large, important terms that were important to me as a director representing the Board."); TT 46:6–11 (Denner) ("Q: And what did you say [to Tyree regarding the implementation of the agreed-upon deal]? A: You know, 'We got the deal and let's have the lawyers get it done.' Q: So now that we've got a deal, let's just turn it over to the lawyers to put it together? A: Right.").

28

At the end of their call, Tyree and Denner confirmed that they "had a deal"[119] and that they would leave it to others on their respective teams to prepare the "paperwork . . . to get it done."[120] Neither Tyree nor Denner indicated, however, that the agreed-upon deal was *contingent* upon the execution of a written agreement.[121] Nor did Tyree indicate that the agreed-upon deal was subject to further Board approval.[122]

Shortly thereafter, Tyree spoke on the phone with Aguiar, and told Aguiar "[what] was communicated [to Denner] and what [Tyree and Denner had] agreed on the big ticket items . . . ."[123] This call served as "[Tyree's] hand-off to the remainder of the Innoviva expanded team."[124] Denner, for his part, instructed Sarissa's team

---

[119] JX 421 (Tyree Dep.) at 89:17 ("I told Alex Denner that we had a deal . . . ."); TT 44:18–20 (Denner) ("Q: Did the two of you say, 'We've got a deal'? A: Yes.").

[120] JX 421 (Tyree Dep.) at 69:21; TT 46:6–8 (Denner) (same).

[121] *See, e.g.*, JX 421 (Tyree Dep.) at 82:20–83:5; JX 398 (Denner Aff.) ¶ 5 (May 30, 2017).

[122] *See, e.g.*, JX 421 (Tyree Dep.) at 69:16–70:7, 82:20–83:5; JX 398 (Denner Aff.) ¶ 5

[123] *Id.* at 70:24–25.

[124] *Id.* at 71:1–2; s*ee also id.* at 71:3–11 ("Q: And after that hand-off– A: I took a nap. Q: –you took a nap. And that's because it had been a pretty stressful several days and long hours? A: No. I've been known to take a nap in the afternoon.").

(and its proxy solicitor) to stop soliciting proxies "[b]ecause we have a deal"[125] and told DiPaolo to work with Innoviva's counsel to finalize the relevant documents.[126]

### 3. The Parties' Counsel Work to Memorialize the Agreed-Upon Settlement

At 2:55 PM, DiPaolo emailed Grossman, noting that Denner and Tyree had spoken and attaching a revised draft settlement agreement.[127] The revised draft contained three notable changes:

1. the opening sentence was revised to state, "This letter agreement is to **confirm** our agreement";[128]

2. Kostas was substituted for Haimovitz as a Sarissa appointee;[129] *and*

3. per the revised draft, Innoviva "confirms, represents and warrants to Sarissa that, concurrently with the execution of this agreement"[130]—

   a. Innoviva "has" increased the size of its Board to nine members and appointed Kostas and Bickerstaff as Innoviva directors;[131] *and*

   b. Innoviva "agrees to" include Kostas and Bickerstaff as nominees of the Board to stand for election as directors at Innoviva's 2017

---

[125] TT 48:3 (Denner).

[126] TT 47:19–48:3 (Denner).

[127] JX 255.

[128] JX 255 at 2 (emphasis supplied).

[129] *Id.*

[130] *Id.*

[131] *Id.*

Annual Meeting, and to use "reasonable best efforts to cause the election of" both Kostas and Bickerstaff at that meeting.[132]

Thereafter, at approximately 3:30 PM, DiPaolo and Grossman spoke on the phone.[133] On that call, the two reviewed the latest revisions to the draft settlement agreement.[134] Grossman indicated that all of DiPaolo's comments were acceptable, and that he (Grossman) just needed to run certain language by his co-counsel.[135] Grossman and DiPaolo also discussed the issuance of a joint press release.[136] During the course of that discussion, the two agreed "to move the concept of issuing the agreed-upon press release from a condition precedent to a covenant . . . ."[137] Finally, Grossman asked DiPaolo for Sarissa's comments on Innoviva's draft press release.[138] DiPaolo advised Grossman that Sarissa's comments would be coming shortly and would consist of reordering certain text, adding Kostas as one of the two nominees and including a (revised) quote from Denner.[139]

---

[132] *Id.*

[133] TT 96:14–20 (DiPaolo); JX 412 (Grossman Dep.) at 105:19–107:11.

[134] TT 96:21–97:2 (DiPaolo), 271:15–272:24 (Grossman).

[135] TT 96:21–97:2 (DiPaolo), 297:15–300:22 (Grossman); JX 412 (Grossman Dep.) at 106:21–107:23.

[136] TT 98:3–99:5 (DiPaolo), 271:18–272:24 (Grossman)

[137] TT 300:16–18 (Grossman).

[138] TT 98:19–99:10 (DiPaolo), 272:14–24 (Grossman).

[139] TT 98:19–99:10 (DiPaolo), 272:14–24 (Grossman).

At 4:14 PM, Grossman's associate emailed clean and marked-up versions of the draft settlement agreement to DiPaolo.[140] The Skadden versions of the agreement contained the agreed-upon language, "This letter agreement is to confirm our agreement."[141] The marked-up version also identified Kostas and Bickerstaff as Sarissa's nominees, consistent with Denner and Tyree's agreement and Sarissa's prior draft.[142] The clean version inadvertently omitted Kostas's name because of a typographical error.[143] In addition, both versions provided that the agreed-upon joint press release was to be issued "[a]s soon as practicable following the execution of this letter agreement . . . ."[144]

At 4:21 PM, Skadden forwarded its cover email and revised version of the settlement agreement to Innoviva's officers and advisors.[145] Aguiar then sent a one-word reply email: "OK."[146] Following a brief exchange between DiPaolo and

---

[140] JX 269.

[141] *Id.* at 2–13. I note that the Skadden versions of the agreement were not marked "draft." *See id.*

[142] *See* JX 421 (Tyree Dep.) at 69:16–24, 70:16–18; TT 43:18–44:20 (Denner); JX 269 at 2; JX 255 at 2.

[143] JX 269 at 9; PTO ¶ 108.

[144] JX 269 at 2, 9.

[145] JX 270.

[146] JX 276.

32

Grossman's associate regarding the timing of the press release, the parties' counsel agreed to replace the phrase "as soon as practicable" in the 4:14 PM version of the agreement with "immediately."[147]

Thereafter, at 4:41 PM, DiPaolo emailed Innoviva's legal team with Sarissa's comments on Innoviva's draft press release.[148] Sarissa's comments included revisions to Denner's quote to include a reference to "GSK's reluctance to support necessary change" (presumably in reaction to GSK's support of the incumbent slate).[149] DiPaolo's email also stated, "Note that we don't like tinkering with other people's quotes but we advise that Waltrip's quote should at least acknowledge that shareholders had issues and that the [B]oard listened . . . Just our advice. . ."[150]

### 4. Innoviva's Board Learns That BlackRock Would Vote in Favor of the Board's Slate of Nominees and Abruptly Disengages With Sarissa

At 4:43 PM, Innisfree sent an email to Innoviva's officers and advisors (including Aguiar and Grossman) with the message, "WE GOT

---

[147] JX 274 (e-mail chain between DiPaolo and Grossman's associate).

[148] JX 278.

[149] *Id.* at 2. The revised Denner quote read, in full, as follows: "Sarissa is very grateful for the overwhelming support we received from independent shareholders. Despite GSK's reluctance to support necessary change, independent shareholders were victorious in bringing about this positive outcome. The new Innoviva will be focused on capital allocation to optimize shareholder value. We look forward to working with the new board for the benefit of all shareholders." *Id.*

[150] *Id.* at 1.

BLACKROCK!!!"[151]    For Innoviva and its Board, this was a critical albeit unanticipated development.  After Vanguard's announcement that it would be voting for Sarissa's nominees, the Board had been operating on the understanding that its nominees "w[ere] unlikely to receive [BlackRock's] vote."[152]   As it turned out, however, BlackRock voted in favor of all seven of the Board's director nominees.[153]  For his part, at least, Grossman "decided to kind of stop communicating with Sarissa after th[e] BlackRock vote came in."[154]

Innoviva's Board reconvened for a telephonic meeting at approximately 5:20 PM.[155]  Aguiar informed the Board that BlackRock had voted "in favor of all seven of the Board's [director] nominees . . . . "[156]  Innisfree reported that "all of the Board's [director] nominees . . . were likely to be elected to the Board at [Innoviva's 2017 Annual Meeting] and that none of the nominees put forth by Sarissa . . . were

---

[151] JX 279.

[152] JX 189 (April 19 Minutes: Morning-Afternoon) at 5; *see* TT 209:10–20 (Aguiar); JX 421 (Tyree Dep.) at 54:24–55:22.

[153] *See* JX 279; JX 299 (Minutes of Innoviva Board Meeting on April 19, 2017 from 5:20 PM to 6:22 PM) ("April 19 Minutes: Evening") at 2.

[154] TT 281:6–8 (Grossman).

[155] JX 299 (April 19 Minutes: Evening) at 1.

[156] *Id.* at 2.

34

likely to be elected . . . ."[157] Aguiar then advised the Board that "he had not executed a signature page for the draft settlement agreement that was being circulated earlier that afternoon."[158] After discussion, the Board determined that Innoviva would "not continue with discussions with Sarissa" and would "instead proceed with the vote at the 2017 Annual Meeting . . . ."[159]

At approximately 7:00 PM, Grossman called DiPaolo and informed him of the Board's decision: Innoviva would not be proceeding with a settlement and instead would "be going forward with" its 2017 Annual Meeting.[160] Understandably agitated, DiPaolo responded, "this is not going to go down this way."[161]

Tyree then emailed Denner at 7:35 PM, advising Denner that he "no longer [had] the backing of the [B]oard."[162] Denner replied: "You cannot back out of an

---

[157] *Id.*

[158] *Id.* at 3.

[159] *Id.* at 5.

[160] TT 281:18–24 (Grossman).

[161] TT 282:6–7 (Grossman); *see* TT 109:17–21 (DiPaolo).

[162] JX 315.

accepted deal. Innoviva agreed to the deal and your lawyers confirmed it. Please call me [ASAP] . . . .”[163] Tyree and Denner spoke later that night.[164]

## F. Innoviva's 2017 Annual Meeting Is Held As Scheduled; Tyree Resigns From Innoviva's Board

Innoviva's 2017 Annual Meeting was held as scheduled on April 20, 2017, and Innoviva's stockholders voted to elect all of the Board's nominees.[165] At a Board meeting later that morning, convened at Tyree's request, Tyree told the other directors that he disagreed with their decision to abandon the settlement with Sarissa, that the decision was "impractical" and that he did not "do business th[at] way . . . ."[166] Tyree also commented that he "did not believe [Innoviva was] anywhere close to being done with Sarissa moving forward"[167] and recommended that Innoviva immediately "open a channel of communication with Sarissa and that the point person in those communications not be [Tyree]."[168]

---

[163] JX 317.

[164] TT 59:7–9 (Denner); JX 421 (Tyree Dep.) at 79:1–80:14.

[165] JX 380 at 2–4 (final report of election inspector on voting results at Innoviva's 2017 Annual Meeting).

[166] JX 421 (Tyree Dep.) at 88:17–89:21; JX 355 (Minutes of Innoviva Board Meeting on April 20, 2017 at 9:30 AM) ("April 20 Minutes").

[167] JX 421 (Tyree Dep.) at 89:1–3.

[168] JX 421 (Tyree Dep.) at 89:6–8.

Ultimately, Tyree resigned from Innoviva's Board on June 2, 2017, notwithstanding that he was then being positioned to succeed Waltrip as the Chairman of the Board.[169] Tyree testified that Innoviva's decision to abandon the settlement with Sarissa was a factor in his decision to resign.[170]

**G. Procedural Posture**

Sarissa filed a "Verified Complaint Pursuant to 8 *Del. C.* § 225 and for Specific Performance" ("Complaint") with the Court on April 20, 2017—the day of Innoviva's 2017 Annual Meeting.[171] In its Complaint, Sarissa claims that Denner and Tyree's phone call the afternoon of April 19, 2017 (the "2:30 PM Call") gave rise to a binding oral settlement agreement between Sarissa and Innoviva, and that Innoviva has breached that agreement.[172]

---

[169] JX 381 (Tyree's resignation letter); JX 421 (Tyree Dep.) at 11:24–12:7, 90:13–91:11.

[170] JX 421 (Tyree Dep.) at 90:17–91:11 (Q: "[D]id the Sarissa matter have anything to do with your resignation, and if so, what? A: It did. Q: And could you tell us what[?] A: Well, as I previously stated, I, in addition to performing my duties as a director, I also have to be practical and I had felt for a long time that a practical solution to Sarissa was better than a legal solution that would only temporarily interrupt the interaction. And I, to this day, I still believe that[] the right thing to do is to look for a practical solution. So yes, Sarissa, yes, Sarissa was a factor in my decision. Q: Did your concern that you didn't do business this way that you've previously discussed, did that factor into it? A: It did. Q: And it's because you don't do business that way[?] A: I don't do business this way.").

[171] JX 383 ("Compl.").

[172] Compl. ¶¶ 31, 36–39.

Under the parties' settlement agreement, according to Sarissa, "two of Sarissa's nominees were to be added to the present seven directors of Innoviva," Sarissa would terminate its proxy contest and "withdraw its [then-pending] § 220 action" and "both sides would vote their proxies in favor of those nominees" at Innoviva's 2017 Annual Meeting, "which was to be adjourned until no later than May 19, 2017."[173] Thus, Sarissa's Complaint asks the Court to "specifically enforce the terms of the parties' agreement and order Innoviva . . . to expand the size of the Board of Directors to nine and appoint Dr. Kostas and Mr. Bickerstaff to the [B]oard."[174]

Innoviva moved to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6).[175] Sarissa then filed an amended complaint (the "Amended Complaint") on May 12, 2017. Most notably, the Amended Complaint expressly alleges that "[t]he parties also agreed to issue a joint press release, but [that] the content of that press release was neither a material term of nor a condition to the[ir] agreement."[176] The legal gravamen of the Amended Complaint, however, remains

[173] Compl. ¶¶ 4, 5, 31. Sarissa's Complaint appears to acknowledge that, as part of the (purported) settlement, the parties agreed to announce the settlement in a joint press release. *See* Compl. ¶¶ 16, 19, 21, 23, 24, 38.

[174] Compl. ¶¶ 15, 16.

[175] D.I. 4.

[176] Am. Compl. ¶ 6.

the same.[177]  Thus, Sarissa's Amended Complaint contains the same breach-of-contract claim and the same request for specific performance set forth in its original Complaint.[178]

Innoviva moved for summary judgment on the Amended Complaint.[179] The Court denied that motion after determining the following genuine disputes of material fact remained: (1) whether Tyree (or Grossman) had actual or apparent authority to bind Innoviva to a settlement agreement with Sarissa without further Board approval; (2) whether Tyree agreed on behalf of Innoviva that Kostas would replace Haimovitz as Sarissa's second designee to the Board; *and* (3) whether the parties' joint issuance of a mutually conciliatory press release was a material term and/or condition precedent of the purported Sarissa-Innoviva settlement agreement.[180]

A one-day trial was held on July 27, 2017, following which the Court heard post-trial oral argument on September 8, 2017.[181]  This is the Court's post-trial decision.

---

[177] *Compare, e.g.*, Am. Compl. ¶¶ 52–59, *with* Compl. ¶¶ 35–42.

[178] *Compare* Am. Compl. at 27, *with* Compl. at 15–16.

[179] D.I. 22.

[180] D.I. 120 at 12:19–15:24.

[181] At post-trial oral argument, Sarissa's counsel abandoned the allegation in Sarissa's Amended Complaint that a joint press release (with a conciliatory quote from Sarissa) "was

## II. ANALYSIS

Sarissa and Innoviva dispute whether they entered into a valid, enforceable settlement agreement. By my lights, the parties' dispute reduces to three issues:

1. Whether Tyree had authority to bind Innoviva to an oral settlement agreement with Sarissa;

2. If Tyree had such authority, whether the 2:30 PM Call created a binding Sarissa-Innoviva contract, *viz.*—whether Denner and Tyree then manifested mutual assent to bind their respective principals (Sarissa and Innoviva) to an oral settlement agreement with "sufficiently definite" terms; *and*

3. If there is a binding oral settlement agreement between the parties, whether specific enforcement of that agreement is warranted.

I address each issue in turn.

### A. Tyree Had Authority to Enter Into an Oral Settlement Agreement With Sarissa on Behalf on Innoviva

An individual corporate director may negotiate a settlement on behalf of the corporation—and bind the corporation to an agreed-upon settlement—provided the director has actual or apparent authority to do so.[182] For the reasons set forth below,

---

n[ot] a material term of . . . the parties' agreement." Am. Compl. ¶ 6; *see* D.I. 129 at 6:9–14 ("[Sarissa] agree[s] that because [the press release] was a material term to Mr. Tyree, and Dr. Denner has said he agreed to the deal, even though [Sarissa] hadn't understood it was a material term, [and] thought it was, of course, [an] implementing . . . term, it was a material term.").

[182] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 540 & n.15 (Del. 1996) (An individual director may "act[] as an agent of the corporation pursuant to [actual] authority granted by the board or imposed by law."); *Schwartz v. Chase*, 2010 WL 2601608, at *5 (Del. Ch. June 29, 2010) (An "agent[] appointed to engage in settlement negotiations must possess [actual] or apparent authority to act on behalf of [the

I conclude that Tyree had both actual and apparent authority to bind Innoviva to an oral settlement agreement with Sarissa.

### 1. Tyree Had Actual Authority

Actual authority requires an extant agency relationship.[183] An agency relationship "arises when one person [or entity] (a 'principal') manifests assent to another person [or entity] (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."[184] Actual authority, then, "is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf."[185]

Where the principal is a corporation, such assent may be manifested in provisions of the corporation's certificate of incorporation or bylaws, or otherwise through board action.[186] Thus, a corporation's governance documents may grant

---

agent's principal]; otherwise a contract arising from those negotiations will not bind the parties.").

[183] *See Billops v. Magness Constr. Co.*, 391 A.2d 196, 197 (Del. 1978) ("Actual authority is that authority which a principal expressly or implicitly grants to an agent.").

[184] *Estate of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011) (quoting Restatement (Third) of Agency § 1.01 (2006) [hereinafter, "Restatement Agency § __"]) (internal quotation marks omitted); Restatement Agency § 1.04(5).

[185] Restatement Agency § 3.01.

[186] *See Petition of Mulco Prods., Inc.*, 123 A.2d 95, 103 (Del. Super. Ct. 1956), *aff'd sub nom., Mulco Prods., Inc. v. Black*, 127 A.2d 851 (Del. 1956).

actual authority to certain of its directors and officers to bind the corporation in contract—whether to a particular contract or type of contract, or more generally.[187] Alternatively, a corporation's board of directors, as such, may cause the corporation to manifest assent that a particular director or officer shall have the power to bind the corporation in contract, provided the corporation's certificate and bylaws do not prohibit such action by the board.[188]

The scope of an agent's actual authority is determined by the agent's reasonable understanding of the principal's manifestations and objectives.[189] Accordingly, "[a]n agent has actual authority to take action designated or implied in the principal's manifestations to the agent and [to take] acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act."[190]

---

[187] *See Mulco Prods.*, 123 A.2d at 103; JX 8 (Innoviva Bylaws) § 7.7 ("The Chairman of the Board, the President or any Vice President may execute . . . contracts . . . for or on behalf of [Innoviva].").

[188] *See Arnold*, 678 A.2d at 540 n.15; *Mulco Prods.*, 123 A.2d at 103.

[189] *See, e.g.*, *Harmon*, 62 A.3d at 1201 ("An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.") (quoting Restatement Agency § 2.01) (internal quotation marks omitted); Restatement Agency § 2.02(1).

[190] Restatement Agency § 2.02(1).

In this case, Tyree had actual authority to bind Innoviva to an oral settlement agreement with Sarissa within certain parameters.[191] This authority can be traced to the express manifestations of Innoviva's Board (and thus, Innoviva) prior to and during the Board's April 19 afternoon meeting (from 1:30 to 1:47 PM), and Tyree's reasonable understanding of those manifestations. Before that meeting, Innoviva's Board had appointed Tyree to act as Innoviva's "lead negotiator" in settlement discussions with Sarissa, and Tyree had accepted that appointment, thus creating a specific agency relationship between Tyree and Innoviva.[192] And during that meeting, Innoviva's Board manifested assent that Tyree contact Denner "to negotiate to see if a settlement agreement including a press release between Sarissa and [Innoviva] could be reached."[193] In that regard, the Board also manifested assent that Tyree convey to Denner the following:

---

[191] I note that Innoviva's bylaws do not prohibit individual Innoviva directors, as such, from binding the corporation in contract. *See* JX 8 (Innoviva Bylaws) § 7.7.

[192] TT 171:7–9 (Friedman) ("Q: But [Tyree] was the lead negotiator [Innoviva's] [B]oard appointed. Right? A: That is correct."); TT 256:10–11 (Grossman) (referring to Tyree as Innoviva's "lead negotiator"); JX 421 (Tyree Dep.) at 14:12–13 ("I was the primary point person in [settlement] discussi[ons] with Dr. Denner.").

[193] April 19 Innoviva Board Meeting Minutes at 8; *see also* Tyree Aff. ¶ 6 ("On the afternoon of April 19, 2017, following a [B]oard meeting wherein I was authorized to attempt to settle with Sarissa, I had a telephone call with Dr. Denner at approximately 1:30 pm [CT].").

43

- that Innoviva was willing to settle with Sarissa without a standstill;[194]

- that, as part of that settlement, Innoviva would expand its Board from seven to nine members and appoint any two of Sarissa's nominees to the Board to fill the resulting vacancies;[195] *and*

- that Sarissa would be required to include a conciliatory quote about Innoviva in the joint press release announcing the settlement.[196]

The Board's authorization of Tyree to offer these terms on the afternoon of April 19, came in the midst of the Board's expectation that BlackRock would vote for "at least two" of Sarissa's director nominees, meaning (1) that "at least two" of Sarissa's three nominees would be elected to the seven-member Board; *and* (2) that "at least two" of Innoviva's existing directors would be replaced.[197] The Board also expected that the final vote tally—including BlackRock's vote—would be published between 4:00 PM and 5:00 PM that day.[198] And with the revelation of BlackRock's

---

[194] JX 421 (Tyree Dep.) at 35:9–15 ("Q: Now, on [April] 19th was it your understanding that [Innoviva's] Board was willing to accept any two of Sarissa's three nominees? A: Yes. Q: And did you communicate that to Dr. Denner? A: Yes."); *id.* at 64:1–9; *see* JX 189 (April 19 Minutes: Morning-Afternoon) at 7.

[195] JX 421 (Tyree Dep.) at 64:1–9; *see* JX 189 (April 19 Minutes: Morning-Afternoon) at 7–8.

[196] JX 421 (Tyree Dep.) at 53:20–22, 64:1–9; *see* JX 189 (April 19 Minutes: Morning-Afternoon) at 7 (referring to a "kumbaya press release"); JX 421 (Tyree Dep.) at 66:8–14 ("Q: Do you recall the term Kumbaya being used? A: Yes, unfortunately.").

[197] JX 189 (April 19 Minutes: Morning-Afternoon) at 5; JX 421 (Tyree Dep.) at 61:1–16.

[198] *See* JX 414 (Aguiar Dep.) at 79:17–80:6; JX 189 (April 19 Minutes: Morning-Afternoon) at 5.

44

(expected) vote for Sarissa's nominees, Sarissa would no longer have an incentive to settle its proxy contest. Thus, for Innoviva's Board, the "clock was ticking down" for Innoviva to reach a binding settlement with Sarissa—and thereby avert an (expected) electoral rout.[199]

Under these circumstances, Tyree reasonably understood the Board's (and thus Innoviva's) manifestations to him during the Board's April 19 afternoon meeting to express Innoviva's assent that (1) within the Settlement Agreement Parameters, Tyree was authorized to make an oral settlement offer on Innoviva's behalf; *and* (2) Denner's oral acceptance of that offer (on Sarissa's behalf) would bind Innoviva to the settlement.[200]  And the record reflects that this was, in fact,

---

[199] TT 234:15–21 (Aguiar); *see* JX 421 (Tyree Dep.) at 61:16–62:11 ("Q: And the reason [the Board's discussions during its April 19 afternoon meeting] centered on a possible settlement [with Sarissa] is because it looked likely at this time that [Innoviva] would lose if it went to the [annual] meeting without a settlement, correct?"  A: Correct.").

[200] To reiterate, as of the Innoviva Board's April 19 afternoon meeting, the Board expected that "at least two" of Sarissa's director nominees would be elected to the Board (in lieu of management's nominees) in the event Innoviva did not settle with Sarissa. JX 189 (April 19 Minutes: Morning-Afternoon) at 5; JX 421 (Tyree Dep.) at 61:16–62:11. That being so, it is not plausible that the Board then established an authority construct requiring second-order approval of the same settlement terms that it authorized Tyree to convey to Denner going into the 2:30 PM Call.  Had the Board established such a construct, it would have risked a time default—that Innoviva would fail to take the necessary approval action(s) before the revelation of BlackRock's (expected) vote for Sarissa's nominees, and would thereby forfeit the possibility of an Innoviva-Sarissa settlement.  Simply put, I do not believe that a sophisticated board like Innoviva's would take such a risk.  Indeed, at trial, Aguiar could not articulate any plausible reason why the Board would have established the aforementioned authority construct given the extreme time pressure to conclude successfully the Sarissa-Innoviva settlement. *See* TT 249–251 (Aguiar). Stated differently, what was there left to approve after the Board authorized Tyree to make a

45

Tyree's understanding.[201] Accordingly, Tyree had actual authority to convey to Denner an oral settlement offer on behalf of Innoviva (on the terms approved by the Board) *and* to bind Innoviva to a settlement with Sarissa on those terms.[202]

---

settlement proposal and Denner accepted that proposal exactly as made? Aguiar had no credible answer to that question. *Id.*

It is also notable that Innoviva's Board made no effort to reconvene before the publication of the final vote tally—notwithstanding that Tyree spoke with Aguiar after the 2:30 PM Call and told him what "was communicated [to Denner]" and "what [was] agreed on the big ticket items . . . ." JX 421 (Tyree Dep.) at 70:24–25. If the Board's (re)approval of the agreed-upon terms was necessary to bind Innoviva to a settlement with Sarissa on those terms, then the Board ostensibly would have sought to reconvene a meeting to (re)approve those terms before the revelation of BlackRock's decisive vote—which the Board expected would be cast in favor of Sarissa's nominees. No such effort was made, and for good reason. The Board well understood that the deal had been struck during the 2:30 PM Call and Sarissa could not back out of it.

[201] *See* JX 421 (Tyree Dep.) at 88:23–89:3 ("[During the Board's April 20 morning meeting,] I commented that from a personal standpoint I don't do business the way [Innoviva] had just concluded [its] business with Sarissa and I commented that I did not believe that [Innoviva was] anywhere close to being done with Sarissa moving forward . . . ."); *id.* at 89:14–18 ("Q: And when you said you didn't do business the way that [it] had been done here, what did you mean by that? A: I told Alex Denner we had a deal and when I told him that, that's what I believed."). Taken in context, the import of Tyree's "we had a deal" testimony is that *Innoviva and Sarissa* had a deal. *See* Tyree Dep. 70:8–13 ("Q: Now, had you [Tyree] said in conversations before that the press release should have him [Denner] saying something nice? A: I never said him, I said you, and the you was in reference to Sarissa not Alex Denner. You have to say something nice about us [*i.e.*, Innoviva]."). I pause here to note what I suspect is obvious from this Opinion—I found Tyree to be an honorable businessman who offered refreshingly candid and credible testimony to the Court with no reason or incentive to do otherwise.

[202] Innoviva argues that the "Board asked Tyree to contact Denner to see if a settlement could be reached only '*subject to* the execution of a settlement agreement including a press release acceptable to the company's counsel and management.'" Def. Innoviva Inc.'s Post-Trial Answering Brief ["DAB"] 53 (Aug. 25, 2017) (quoting JX 189 (April 19 Minutes: Morning-Afternoon) at 8) (emphasis in original). Innoviva's argument, however, is inconsistent with the language of the Board resolution whereby Innoviva's "Board authorize[d] and request[ed] that Mr. Tyree contact Dr. Denner to negotiate to see if a

## 2. Tyree Had Apparent Authority

Unlike actual authority, apparent authority does not depend on the existence of an underlying agency relationship, and may arise even where no such relationship exists.[203]   Apparent authority "is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to

---

settlement agreement including a press release between Sarissa and [Innoviva] could be reached."  JX 189 (April 19 Minutes: Morning-Afternoon) at 8.  The full authorizing resolution, as reported in the minutes, was as follows:

> RESOLVED, that, subject to the execution of a settlement agreement including a press release acceptable to the Company's counsel and management, the Board authorizes management to work with the Company's counsel in drafting supplemental proxy materials relating to the adjourned 2017 Annual Meeting to be mailed to the Company's stockholders, **and that** the Board authorizes and requests that Mr. Tyree contact Dr. Denner to negotiate to see if a settlement agreement including a press release between Sarissa and the Company could be reached. [*Id.* (emphasis supplied).]

The authorizing resolution's "subject to" clause only modifies the immediately following clause (concerning the drafting of supplemental proxy materials). *See id.*  The "subject to" clause *does not* modify the separate content clause regarding Tyree's authority to "contact Dr. Denner to negotiate to see if a settlement agreement including a press release between Sarissa and [Innoviva] could be reached."  *Id.*  Of course, all of this assumes that the minutes accurately report the exact words of the authorizing resolution.  In this regard, I note that Tyree's deposition testimony indicates that the minutes merely capture the "substance" of that resolution, rather than its exact words.  JX 421 (Tyree Dep.) at 68:24–69:3 ("Q: And was [the authorizing resolution in the minutes] said in words or in substance?  A: Substance.  This was a fast moving conversation that led to this resolution being described."); *see Schroder*, 299 A.2d at 440 ("Although the minutes of a directors' meeting are the best evidence of what took place there, [extrinsic] evidence is admissible to supplement or contradict the events as reported in the minutes.").

[203] *See Vichi v. Koninklijke Philips Elecs.*, N.V., 85 A.3d 725, 799 (Del. Ch. 2014).

the principal's manifestations."[204]  Thus, even if a person lacks actual authority to bind an entity to a contract with a third party, the person still may have *apparent* authority to do so.[205]  For instance, a non-agent director has apparent authority to bind the corporation to a contract with a third party if (1) the third party reasonably believes that the director has such authority; and (2) that belief is traceable to the corporation's manifestations.[206]

A corporate principal may make a manifestation to a third party concerning an agent's authority "by placing [the] agent in charge of a transaction or situation."[207] In particular, where a corporate principal has designated an agent as its "exclusive

---

[204] *Vichi*, 85 A.3d at 799 (quoting Restatement Agency § 2.03) (internal quotation marks omitted); *see also Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *10 (Del. Ch. Aug. 26, 2005) (noting that "apparent authority is that authority which . . . the principal holds [the agent] out as possessing.").

[205] *See Vichi*, 85 A.3d at 799.

[206] *See id.*; *cf. Int'l Boiler Works Co. v. Gen. Waterworks Corp.*, 372 A.2d 176, 177 (Del. 1977) (holding that an individual employed by a subsidiary of defendant corporation had apparent authority to enter into a contract on the corporation's behalf where "the circumstances surrounding [the] negotiation of the transaction created the impression that [the individual] was an employee of defendant [corporation]").

[207] Restatement Agency § 3.03 cmt. b; *id.* (commenting that a corporate "principal may make an additional manifestation by permitting or requiring the agent to serve as the third party's exclusive channel of communication to the principal."); *see, e.g.*, *Int'l Boiler Works*, 372 A.2d at 177–78 (finding that apparent authority of employee of corporate defendant's subsidiary to bind defendant in contract was evidenced by defendant's "bid solicitation document," which (1) "directed bidders to send all bids to [the employee] at the office of defendant's Heating Division in Philadelphia," *and* (2) "instructed bidders to submit any 'questions regarding the technical aspects' of the project" to the employee at that same office).

channel of communication" with a third party, that designation can "constitute a manifestation of [the corporation's] assent to be bound in accordance with . . . communication[s]" made through that channel.[208]

Here, the evidence clearly reveals that Tyree had apparent authority to bind Innoviva to a settlement agreement with Sarissa. *First*, Denner, Sarissa's principal, believed that Tyree spoke on behalf of Innoviva's Board (and so Innoviva), and thus was authorized to enter into a settlement agreement on Innoviva's behalf.[209] *Second*, it was reasonable for Denner to believe this. Tyree was Innoviva's "lead negotiator" in settlement discussions with Sarissa and the only Innoviva Board member with whom Denner negotiated during the critical April 18–19 time period.[210] In addition, there is no evidence that Innoviva then communicated (or otherwise indicated) to Denner that Tyree was not authorized to enter into a settlement agreement on Innoviva's behalf.[211] *Finally*, Denner's reasonable belief that Tyree was authorized

---

[208] Restatement Agency § 1.03 cmt. c.

[209] TT 45:16–22 (Denner); JX 317 (e-mail from Denner to Tyree, sent on April 19, 2017 at 7:42 PM, in which Denner writes, "You cannot back out of an accepted deal. Innoviva agreed to the deal and your lawyers confirmed it").

[210] PTO ¶ 70; TT 171:7–9 (Friedman); *see* TT 62:23–62:3 (Denner) ("Q: Once you got down to actually attempting to negotiate a potential settlement, the only person that you talked to from Innoviva was Mr. Tyree; right? A: Yes."); TT 221:15–16 (Aguiar) ("Again, Mr. Tyree was the one who had the communication channel with Dr. Denner[.]").

[211] Indeed, the draft settlement agreement that Grossman sent to DiPaolo on April 19, 2017 at 2:02 PM could have stated (like prior drafts) that it would become effective only upon execution, and thereby suggested that Tyree was without authority to bind Innoviva.

to take such action on Innoviva's behalf is traceable to Innoviva's manifestations, namely, (1) Innoviva's having appointed Tyree as Innoviva's "lead negotiator" in settlement discussions with Sarissa; *and* (2) Innoviva's having permitted Tyree to serve as Innoviva's exclusive channel of settlement-related communications with Denner during the critical April 18–19 time period.[212]  For these reasons, I find that Tyree had apparent authority to bind Innoviva to a settlement agreement with Sarissa.

### 3. There Was No Improper Delegation of the Board's Duties

Innoviva contends that Tyree "did not have authority . . . to enter into the alleged oral agreement because this would involve an improper delegation of

---

*See* JX 245.  Instead, the 2:02 PM draft agreement, as written, made clear that acceptance-by-execution was not required.  *Id.*  At most, the 2:02 PM draft agreement *invited* acceptance-by-execution, given that it included signature lines.  *Id.* at 4–6. *See* Restatement (Second) of Contracts § 30(1) (1981) [hereinafter, "Restatement Contracts § __"] ("An offer may invite or require acceptance to be made by an affirmative answer in words, or by performing or refraining from performing a specified act, or may empower the offeree to make a selection of terms in his acceptance."); Restatement Contracts § 32 ("In case of doubt an offer is interpreted as inviting the offeree to accept either by promising to perform what the offer requests or by rendering the performance, as the offeree chooses.").  In theory, then, Sarissa and Innoviva could have manifested assent to be bound by the 2:02 PM draft settlement agreement by starting to perform in accordance with the terms of that agreement.  *See* Restatement Contracts §§ 30(1), 32.  Given the time pressure on both parties to get the deal done, Grossman's having sent the 2:02 PM draft settlement agreement to DiPaolo is entirely consistent with Tyree's having apparent authority to bind Innoviva to an oral settlement agreement on the same (or materially similar) terms.

[212] Restatement Agency § 3.03 cmt. b; *see Int'l Boiler Works*, 372 A.2d at 177–78.

50

the Board's fiduciary and statutory duties."[213]  Specifically, Innoviva argues that, under 8 *Del. C.* §§ 141(b), 223(a)(1) and Section 3.9 of Innoviva's Bylaws, "decisions regarding who should fill Board vacancies cannot be delegated to an individual director or a third person, but must be decided by the entire Board acting by majority vote."[214]  Innoviva's argument, however, misapprehends the facts proven at trial and the statutory and bylaw provisions upon which it relies.

Section 3.9 of Innoviva's Bylaws is complementary to Section 3.2 of Innoviva's Bylaws, which provides that Board approval (by majority resolution) is required to expand the size of the Board, consistent with 8 *Del. C.* § 141(b).[215] Section 3.9, in turn, provides that newly created Innoviva directorships may only be filled by a "majority vote of directors then in office," consistent with 8 *Del. C.* § 223(a)(1).[216] Nothing in this section prohibits a majority of Innoviva's Board from deciding (without a formal vote) who should fill "to-be-created" directorships and,

---

[213] DAB at 55.

[214] DAB at 56 (citing 8 *Del. C.* §§ 141(b), 223(a)(1) and Innoviva Bylaws § 3.9).

[215] Innoviva Bylaws § 3.2; 8 *Del. C.* § 141(b) ("A majority of the total number of directors shall constitute a quorum for the transaction of business unless the certificate of incorporation or the bylaws require a greater number.").

[216] Innoviva Bylaws § 3.9; 8 *Del. C.* § 223(a)(1) ("Unless otherwise provided in [the corporation's] certificate of incorporation or bylaws . . . [v]acancies and newly created directorships resulting from any increase in the authorized number of directors . . . may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director[.]").

upon reaching a decision in that regard, authorizing an individual director to bind the Board to that decision via contract. In other words, Section 3.9 does not prohibit what happened here.

During the Board's April 19 afternoon meeting, the Board conditionally resolved to expand the size of the Board from seven to nine members, consistent with Section 3.2 of Innoviva's Bylaws.[217] This was done in anticipation of Innoviva's entry into a settlement with Sarissa.[218] The Board also authorized Tyree to represent (or offer) to Denner that the Board would appoint (presumably by later vote) any two of Sarissa's three nominees to the Board if the proxy contest was settled.[219] That is to say, if Sarissa accepted Innoviva's settlement proposal, then Innoviva's Board would be expanded from seven to nine members, and "a majority . . . of [the seven] directors then in office" would vote to appoint any two

---

[217] JX 189 (April 19 Minutes: Morning-Afternoon) at 8.

[218] *See id.*

[219] *See* TT 248:19–249:8 (Aguiar) (confirming that Tyree was authorized to convey to Denner that Innoviva would accept Kostas as one of Sarissa's two Board appointees); JX 421 (Tyree Dep.) at 35:9–15 ("Q: Now, on [April] 19th was it your understanding that [Innoviva's] Board was willing to accept any two of Sarissa's three nominees? A: Yes. Q: And did you communicate that to Dr. Denner? A: Yes."), 67:14–22 (Q: You've previously told us that the Board would take any two of [Sarissa's] three [nominees], correct? A: Yes, I did. Q: And that's your understanding of what was decided [by the Board]? A: Yes, it is. Q: So it was not your understanding that it was limited to Bickerstaff and Haimovitz? A: It was not. Q: And do you recall being told in words or substance that it was limited to Bickerstaff and Haimovitz? A: I do not.").

52

of Sarissa's three nominees to fill the resulting Board vacancies—consistent with Section 3.9 of Innoviva's Bylaws.[220]

Here, it was Innoviva's Board that made the foregoing determinations, not Tyree. Indeed, the settlement terms that Tyree was authorized to convey to Denner were *Innoviva's* settlement terms, *i.e.*, the settlement terms approved by Innoviva's Board. Under these circumstances, as proven by Sarissa at trial, I am satisfied that Tyree's authority to bind Innoviva to an oral settlement agreement with Sarissa on

---

[220] Innoviva Bylaws § 3.9. The minutes of the Board's April 19 afternoon meeting (drafted after this litigation was initiated) state that the Board's future performance of its commitments to expand the Board's size and seat two of Sarissa's nominees will "be subject to the execution of a settlement agreement including a press release acceptable to [Innoviva's] management and counsel." JX 189 (April 19 Minutes: Morning-Afternoon) at 8; JX 412 (Grossman Dep.) at 20:22–25:13. This "subject to" phraseology reflects that the Board expected to have a settlement agreement signed and a press release issued before the two Sarissa nominees were formally placed on the expanded Innoviva Board. The mere presence of such language in the minutes, however, does not serve as credible evidence that the Board actually intended to condition the settlement itself on the execution of a writing or the issuance of an "acceptable" press release (or both). The credible testimony of Tyree says otherwise. *See* JX 421 (Tyree Dep.) at 64:1–9 ("Q: And what were you instructed to do [by the Board]? A: To communicate the original two primary components of a[] [settlement] agreement, [Innoviva will] take two of [Sarissa's] directors, [Sarissa] ha[s] to say something nice about [Innoviva in the joint press release announcing the settlement] and the third point which was [Innoviva] won't insist on standstill. Q: And the Board gave you authority to make that proposal? A: It did."), 67:14–19 (Q: You've previously told us that the Board would take any two of [Sarissa's] three [nominees], correct? A: Yes, I did. Q: And that's your understanding of what was decided [by the Board]? A: Yes, it is."); *see also* TT 248:19–249:8 (Aguiar) (confirming that Tyree was authorized to convey to Denner that Innoviva would accept Kostas as one of Sarissa's two Board appointees); *Schroder*, 299 A.2d at 440 (recognizing that events as reported in corporate minutes may be supplemented or contradicted by extrinsic evidence).

terms approved by Innoviva's Board was entirely consistent with Section 141(b)'s and 223(a)(1)'s requirements that the creation and filling of new directorships be properly authorized by the board of directors in accordance with the corporation's governing documents.[221]

## B. Denner and Tyree Formed a Valid, Binding Contract Between Sarissa and Innoviva

Sarissa claims that Denner and Tyree created a valid, binding contract between Sarissa and Innoviva during the 2:30 PM Call. Innoviva disagrees and argues (1) that "the parties never reached a meeting of the minds on all material terms of a settlement";[222] *and* (2) that "the parties did not intend to enter into a binding oral contract, but instead understood that any contract would be in an executed written agreement."[223]

Under Delaware law, "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."[224] A valid contract exists when (1) the parties have made a bargain with "sufficiently definite" terms; and (2) the parties have manifested mutual assent to be bound by

---

[221] 8 *Del. C.* §§ 141(b), 223(a)(1).

[222] DAB at 30.

[223] *Id.*

[224] *Wood v. State*, 2003 WL 168455, at *2 (Del. Jan. 23, 2003) (ORDER).

that bargain.[225]  The presence or absence of such mutual assent "is to be determined objectively based upon the[] [parties'] expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent[.]"[226]  In this regard, the relevant inquiry is:

> [W]hether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement concluded the negotiations . . . .[227]

A contract need not be in writing to be valid: "Where the objective, contemporaneous evidence indicates that the parties have reached an agreement, they are bound by it, regardless of its form or the manner in which it was manifested."[228]  Thus, if an oral settlement agreement meets the requisites of a valid contract, it will bind the parties the same as a written settlement agreement.[229]

Moreover, "'the fact that the parties [to an oral agreement] manifest an intention to prepare and adopt a written memorial' will not prevent contract formation if the evidence reveals '[m]anifestations of assent that are in themselves

---

[225] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

[226] *Debbs v. Berman*, 1986 WL 1243, at *7 (Del. Ch. Jan. 29, 1986) (citation omitted).

[227] *Leeds v. First Allied Connecticut Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986).

[228] *Debbs*, 1986 WL 1243, at *7.

[229] *See, e.g.*, *Rowe v. Rowe*, 2002 WL 1271679, at *3 (Del. Ch. May 28, 2002) ("Oral settlement agreements reached among the parties to a dispute are binding.").

sufficient to conclude a contract.'"[230]  Indeed, "[w]here a settlement agreement has been reached, 'the fact, alone, that it was the [parties'] understanding that the contract should be formally drawn up and [executed], [does] not leave the transaction incomplete and without binding force, in the absence of a *positive agreement* that it should not be binding until so reduced to writing and formally executed."[231]

Here, "the objective, contemporaneous evidence" reflects that Denner (for Sarissa) and Tyree (for Innoviva) reached agreement on the essential terms to settle the proxy contest during their 2:30 PM Call on April 19.  Given the exigencies under which that agreement was reached, a "reasonable negotiator . . . would have concluded that the agreement reached constituted agreement on all of the terms that [Sarissa and Innoviva] themselves regarded as essential and thus[,] that that agreement concluded the [parties'] negotiations."[232]  At the risk of telling a Sisyphean tale, a review (again) of the timeline in which these parties negotiated their deal provides vivid color to a picture that leaves little doubt that

---

[230] *Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 1288 (Del. Ch. 2004) (quoting Restatement Contracts § 27).

[231] *Whittington v. Dragon Gp. L.L.C.*, 2013 WL 1821615, at *3 (Del. Ch. May 1, 2013) (quoting *Loppert*, 865 A.2d at 1285 (emphasis in original)).

[232] *Leeds*, 521 A.2d at 1097.

"a manifestation of mutual assent to the exchange and a consideration" occurred here.[233]

As noted, Sarissa and Innoviva started to discuss a potential settlement in earnest on April 18. Denner and Tyree held several telephone conversations that day regarding the components of a potential settlement. In these conversations, Sarissa's "bid" was "two directors, no standstill," and Innoviva's "ask" was "two directors, a standstill, and [a press release in which Sarissa would] say something nice about [Innoviva]."[234] Eventually, Tyree asked Denner to put Sarissa's position into writing so that Tyree could show it to Innoviva's Board.[235] At 6:31 PM on April 18, Denner sent the following e-mail (drafted by DiPaolo) to Tyree:

> The [B]oard would today resolve to increase its size by two and immediately add George Bickerstaff and Jules Haimovitz to the [B]oard and would also resolve today to add these two directors to the slate for the 2017 [Annual] [M]eeting. The [B]oard would then send out new proxy materials with the reconstituted slate. Sarissa would agree to withdraw its nomination notice and not nominate anyone at the meeting. Sarissa would also agree to drop its 220 request. All of this would be announced by the company in a press release today and an 8-K filing tomorrow. Sarissa would also this announce in a press release today and an SEC filing tomorrow. This may require a short

---

[233] *Wood,* 2003 WL 168455, at *2.

[234] JX 421 (Tyree Dep.) at 34:5–6; TT 31:14–32:6, 37:7–38:6 (Denner).

[235] TT 32:7–13 (Denner); *see* JX 421 (Tyree Dep.) at 45:3–18.

adjournment. [Grossman] and I should exchange emails confirming both sides have agreed to do this.[236]

Following a telephonic meeting of Innoviva's Board at 7:30 PM, Tyree and Denner had another phone call later that evening.[237] During that call, Tyree reiterated to Denner the essential terms of Innoviva's settlement proposal: Innoviva would appoint two Sarissa nominees to the expanded (nine-member) Innoviva Board, subject to a standstill; and the parties would announce the settlement in a conciliatory joint press release.[238] Denner's response was, "two directors, no standstill, and [Sarissa would] work on the press announcement to make it so that [Sarissa and Innoviva] look like we're shaking hands and getting [the proxy contest] behind us."[239] The parties were negotiating in circles.

At 11:28 PM on April 18, Grossman (at the Board's direction) emailed a draft settlement agreement to DiPaolo.[240] The terms of that draft agreement were consistent with the terms outlined in Sarissa's 6:31 PM e-mail in all material respects, except that the draft agreement provided (1) that Sarissa must agree to a

---

[236] JX 149.

[237] JX 189 (April 19 Minutes: Morning-Afternoon) at 3–4; JX 421 (Tyree Dep.) at 53:13–22.

[238] JX 421 (Tyree Dep.) at 53:13–22; JX 189 (April 19 Minutes: Morning-Afternoon) at 3–4.

[239] JX 421 (Tyree Dep.) at 53:20–22; TT 37:7–38:6 (Denner).

[240] *See* JX 164 (April 18 Skadden Draft Agreement).

58

one-year standstill;[241] and (2) that it (the draft agreement) would "become effective" only when its signature pages were "signed by each of the Parties and delivered to the other Party . . . ."[242] Mindful of the urgency, DiPaolo sent a reply e-mail to Grossman at 3:32 AM on April 19, 2017, stating, "We are not philosophically opposed to having a very simple agreement without a standstill. Unfortunately, I don't think there is time to get this done via agreement. Our deal is very simple and shouldn't require any agreement. . . ."[243] Grossman replied five minutes later that he would "convey [Sarissa's] view to [Innoviva's Board]."[244]

At this juncture, then, the essential disconnect between the parties was whether the contemplated Sarissa-Innoviva settlement would include a standstill—not whether the settlement would require a written agreement. To the extent it was still an open issue at this point whether the contemplated settlement would require a written agreement to take effect (the evidence does not suggest this), it does not appear that either party manifested that a written, signed agreement was a *sine qua non* of the settlement.

---

[241] *Id.* §§ 1(a)–(c), 2.

[242] *Id.* § 10.

[243] JX 171.

[244] *Id.*

59

As of the morning of April 19, Innoviva continued to insist on a standstill.[245] And Sarissa, in turn, continued to reject a standstill.[246] The parties thus remained at an impasse. Innoviva's position changed, however, once Innoviva's Board learned that Vanguard would be voting for Sarissa's director nominees.[247] Having lost Vanguard's vote, Innoviva's Board expected that it would lose BlackRock's vote as well, making it highly likely that "at least two" of Sarissa's three candidates would be elected to the Board in place of two of Innoviva's nominees.[248]

From its perspective, the Board was on the brink of an electoral shellacking when it met at 1:30 PM the afternoon of April 19. During that meeting, the Board determined (1) that Innoviva would settle with Sarissa without a standstill; (2) that, as part of that settlement, Innoviva would expand its Board from seven to nine members and appoint two of Sarissa's nominees to Innoviva's expanded Board as directors; *and* (3) that the settlement would require Sarissa to include a conciliatory quote about Innoviva in the joint press release announcing the settlement.[249] Tyree

---

[245] *See, e.g.*, JX 189 (April 19 Minutes: Morning-Afternoon) at 3–5.

[246] *Id.* at 5; JX 421 (Tyree Dep.) at 56:7–57:23; TT 41:22–42:16 (Denner).

[247] *See, e.g.*, JX 189 (April 19 Minutes: Morning-Afternoon) at 5–8; JX 421 (Tyree Dep.) at 64:1–9.

[248] JX 189 (April 19 Minutes: Morning-Afternoon) at 5; JX 421 (Tyree Dep.) at 61:16–62:11.

[249] JX 421 (Tyree Dep.) at 64:1–9; *see* JX 189 (April 19 Minutes: Morning-Afternoon) at 7–8.

was authorized to convey the foregoing settlement terms to Denner and "to negotiate to see if a [Sarissa-Innoviva] settlement agreement [on those terms] . . . could be reached."[250]

Shortly thereafter, at 2:02 PM, Grossman (at the Board's direction) emailed DiPaolo a short draft settlement agreement and press release.[251] The draft agreement captured the terms just authorized by the Board along with additional details that had been agreed to early on in the parties' negotiations.[252] Significantly, unlike the April 18 draft agreement, this draft agreement *did not* provide that it would "become effective" only when its signature pages were "signed by each of the Parties and delivered to the other Party . . . ."[253]

At approximately 2:30 PM, Tyree placed the key phone call to Denner.[254] When the two connected, Tyree conveyed Innoviva's revised settlement proposal, which matched the terms he had been authorized to offer by the Board.[255] These terms, in essence, matched the terms Sarissa had been asking for since at least the

---

[250] JX 189 (April 19 Minutes: Morning-Afternoon) at 8.

[251] JX 245.

[252] JX 245 at 2–3; *see* JX 164 (April 18 Skadden Draft Agreement) §§ 1(a)–(c); JX 149 (April 18 Sarissa Settlement Proposal E-Mail).

[253] *Compare* JX 164 (April 18 Skadden Draft Agreement) § 10, *with* JX 245 at 2–4.

[254] TT 43:18–44:5 (Denner); JX 421 (Tyree Dep.) at 69:12–24; *see also* Tyree Aff. ¶ 6.

[255] JX 421 (Tyree Dep.) at 69:16–19; TT 43:18–44:20 (Denner).

night before. Not surprisingly, then, Denner promptly accepted Innoviva's proposal on behalf of Sarissa without reservation, thereby resolving the last open item between the parties (the standstill).[256] Accordingly, at the conclusion of the 2:30 PM Call, Denner and Tyree confirmed that they "had a deal" and that they would leave it to others on their respective teams to prepare the "paperwork . . . to get it done."[257] Neither Tyree nor Denner indicated, however, that the settlement was contingent upon the execution of a written agreement or the finalization of the joint press release.[258] Nor did Tyree indicate that the agreed-upon deal was contingent upon

---

[256] JX 421 (Tyree Dep.) at 69:16–24; TT 44:6–20 (Denner). Insofar as Denner believed that Sarissa did not agree to a conciliatory joint press release as a "term" of the Sarissa-Innoviva settlement, *see* TT 77:18–78:5 (Denner), Denner's subjective belief in this regard is of no legal import. "Under Delaware law, 'overt manifestation of assent—not subjective intent—controls the formation of a contract.'" *Black Horse Capital, LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at \*12 (Del. Ch. Sept. 30, 2014) (citation omitted). Thus, the relevant inquiry is what a reasonable negotiator in Tyree's position would have understood Denner (and Sarissa) to have agreed to. *See Leeds*, 521 A.2d at 1097. In this regard, I note that Tyree—the model of a reasonable negotiator—understood that Denner (and Sarissa) had agreed that Sarissa would include a conciliatory quote about Innoviva in the joint press release announcing the settlement. *See* JX 421 (Tyree Dep.) at 83:3–9 ("Q: And is it fair to say you believe that you and [Denner] agreed to all of the high level necessary terms? A: Yes."), 85:10–13 ("I had reached agreement with Alex Denner on the large, important terms that were important to me as a director representing the Board."); TT 46:20–47:4 (Denner) ("Q: But you understood that there would be a press release; right? A: Yes. Q: And you understood that it would be conciliatory? A: Obviously, yeah. Q: And you assumed that Mr. Tyree assumed the same thing; right? A: Yes.").

[257] JX 421 (Tyree Dep.) at 69:21; TT 46:6–8 (Denner) (to the same effect).

[258] *See* JX 421 (Tyree Dep.) at 82:20–83:5; JX 398 (Denner Aff.) ¶ 5.

further approval by Innoviva's Board.[259]  Indeed, at this juncture, the overriding objective—for both parties—was to get the deal done.

Insofar as the parties might have understood that the agreement reached by Denner (for Sarissa) and Tyree (for Innoviva) "should be formally drawn up and [executed]," the evidence makes clear that parties did not *positively agree* that such agreement "should not be binding until so reduced to writing and formally executed."[260]  Here, the manifestations of assent made by Denner and Tyree, respectively, during their 2:30 PM Call were "in themselves sufficient to conclude a[n] [oral] contract" between Sarissa and Innoviva.[261]

Following the 2:30 PM Call, the parties' attorneys set about memorializing their settlement agreement in writing.  Thus, the parties' attorneys revised Grossman's 2:02 PM draft letter agreement to (1) state that the letter's purpose was "to confirm our agreement";[262] and (2) "move the concept of issuing the agreed-upon

---

[259] *See* JX 421 (Tyree Dep.) at 69:12–70:7, 82:20–83:5, 89:17–18; TT 45:16–22, 57:24–58:19 (Denner); JX 398 (Denner Aff.) ¶ 5.

[260] *Whittington*, 2013 WL 1821615, at *3.  *See also Loppert*, 865 A.2d at 1288 ("'the fact that the parties [to an oral agreement] manifest an intention to prepare and adopt a written memorial' will not prevent contract formation if the evidence reveals '[m]anifestations of assent that are in themselves sufficient to conclude a contract.'") (quoting Restatement Contracts § 27).

[261] *Loppert*, 865 A.2d at 1288.

[262] JX 269 at 9 (Skadden Version of Letter Agreement (Clean), as of 4:14 PM on April 19, 2017).

press release from a condition precedent to a covenant . . . ."[263] Such revisions reflect the attorneys' shared understanding that Sarissa and Innoviva had already reached a deal.[264] By 4:30 PM, the parties' attorneys had finalized the language of a confirmatory letter agreement.[265]

Thereafter, at 4:42 PM, DiPaolo emailed Grossman with Sarissa's comments on Innoviva's draft press release.[266] If BlackRock's vote for the Board's nominees had not come in when it did (at 4:43 PM), Sarissa and Innoviva undoubtedly would have finalized the joint press release language, as well.[267] After learning of

---

[263] TT 300:16–18 (Grossman). This distinction between "condition precedent" and "covenant" is significant, as is Innoviva's assent to revise the letter agreement to make the press release a "covenant" rather than a "condition precedent" of the settlement. The press release as a "condition precedent" would allow Innoviva to walk away from the settlement if Sarissa failed to perform; the press release as "covenant" would allow Innoviva to sue for breach of contract if Sarissa failed to perform. *See* TT 301:4–15 (Grossman) (characterizing a "condition precedent" as event that must occur before a deal can "come into effect," and a "covenant" as "an agreement to do something"). Non-performance of the "covenant," however, would not provide a basis for Innoviva to walk away from the deal (unless, of course, Sarissa committed a material breach of the press release term after the parties engaged in good faith negotiations of the press release language). *See* TT 301:1–15 (Grossman*); BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003).

[264] *Cf. Trexler v. Billingsley*, 166 A.3d 101 (Del. 2017) (TABLE) ("The parties' actions following the deal are also informative" in determining whether they mutual assented to be bound.).

[265] *See* JX 274 (e-mail chain between DiPaolo and Innoviva's legal team, timestamped as of 4:29 PM on April 19, 2017).

[266] JX 278.

[267] Innoviva's rejection of Sarissa's comments on the 2:02 PM draft press release does not allow Innoviva to escape its contractual obligations. I do not doubt that Innoviva found Sarissa's comments on the draft press release irksome. *See* TT 162:15–164:4 (Friedman);

64

BlackRock's vote, however, Innoviva abruptly terminated all settlement-related communications with Sarissa.[268]

The foregoing narrative, fully supported by the preponderance of the evidence in the trial record, compels the conclusion that Sarissa carried its burden to prove that the parties entered a binding contract during the 2:30 PM Call comprised of the following terms (the "Sarissa-Innoviva Settlement Agreement"):

1. Innoviva was required to expand its Board from seven members to nine and add any two of Sarissa's three nominees to the Board as directors, without requiring a standstill;[269]

---

TT 204:6–205:9 (Aguiar). Nevertheless, Innoviva was contractually obligated to make a good faith effort to finalize the language of the parties' press release as a "covenant" of the deal. *See Titan Inv. Fund II, LP v. Freedom Mortg. Corp.*, 2012 WL 1415461, at *10 (Del. Super. Ct. Mar. 27, 2012) ("In every contractual relationship there is an obligation for the parties to act with good faith towards accomplishing the terms of their agreement."), *aff'd in relevant part*, 58 A.3d 984 (Del. 2012) (TABLE) ("[T]he Superior Court correctly determined that [the cross-appellant] breached the [parties' agreement] . . . by ceasing to continue negotiations with [the cross-appellee] in good faith."). It failed to do so. *See, e.g.*, JX 278 (email from DiPaolo to Grossman, sent on April 19, 2017 at 4:42 PM, attaching Sarissa's comments on Innoviva's draft press release (JX 245 at 8)); TT 106:20–22 (DiPaolo) ("Now, did you ever receive any comments from Innoviva or their counsel on [Sarissa's 4:42 PM] markup [of Innoviva's draft press release]?" A: I did not.").

[268] *See, e.g.*, TT 281:6–13 (Grossman) (acknowledging that Grossman "decided to kind of stop communicating with Sarissa after th[e] BlackRock vote came in" at 4:43 PM, and stating that Innoviva's Board "ultimately decided to instruct [him] to terminate the discussions [he was] having" with Sarissa).

[269] *See* JX 421 (Tyree Dep.) at 69:16–24; TT 44:6–20 (Denner).

65

2. Sarissa was required to terminate its proxy contest, withdraw its nomination notice and dismiss its pending books-and-records action against Innoviva;[270]

3. Sarissa and Innoviva were required to issue a mutually conciliatory joint press release announcing the settlement;[271] *and*

---

[270] Sarissa had already agreed to terminate its proxy contest and dismiss its Section 220 case if the parties reached a settlement on Sarissa's board nominees. *See, e.g.*, JX 149 (April 18 Sarissa Settlement Proposal E-Mail) ("Sarissa would agree to withdraw its nomination notice and not nominate anyone at the [2017 Innoviva Annual Meeting] . . . [and] would also agree to drop its 220 request."); JX 421 (Tyree Dep.) at 53:20–22; TT 37:7–38:6 (Denner). The only material open issue between the parties, as stated, was the standstill agreement (and perhaps the press release). Thus, Tyree reasonably understood that there was no need to revisit closed issues during the 2:30 PM Call. *See, e.g.*, JX 421 (Tyree Dep.) at 39:21–40:5, 45:3–18, 70:3–7.

[271] *See, e.g.*, JX 421 (Tyree Dep.) at 53:18–22, 69:12–24, 83:3–9; TT 38:18–24 (Denner). In this regard, I note that, ordinarily, the Court would hesitate to specifically enforce a contract requiring the parties to issue a "mutually conciliatory" joint press release. Absent some objective indication of the meaning that a reasonable negotiator in the place of the parties would have attached to that concept, the Court would lack a sound basis to determine whether a particular press release was, in fact, mutually conciliatory in the relevant sense. *See Centreville Veterinary Hosp. v. Butler-Baird*, 2007 WL 1965538, at *8 (Del. Ch. July 6, 2007) ("'[A]n agreement to agree in the future *without any reasonably objective controlling standards* is unenforceable.'") (emphasis supplied) (citation omitted). Here, however, there exists an objective reference point for what a reasonable negotiator in the place of Sarissa and Innoviva, respectively, would have understood to constitute a mutually conciliatory press release; namely, the draft press release that Innoviva's counsel sent to Sarissa's counsel at 2:02 PM on April 19, 2017. JX 245 at 8. Sarissa, for its part, has indicated that it is (and would have been) willing to accept the language of that press release. D.I. 129 at 43:1–2 (stating that Sarissa is "quite willing to take the language from Innoviva's first draft [of the press release]"); *id.* at 53:4 (stating that Sarissa will "take the first press release['s] language"); TT 54:1–5 (Denner) ("Q: And, frankly, if [Innoviva had] come back to [Sarissa] and said, 'We're not going to make any changes [to the 2:02 PM draft press release], it's the quote [Innoviva] gave [Sarissa] or nothing,' what would [Sarissa] have done? A: [Sarissa] still would have done it."). I am satisfied that these circumstances allow for specific performance of the press release element of the parties' agreement (fully appreciating that changed circumstances (*e.g.*, this litigation) will likely require some further edits to what is delivered to the press should the parties determine that a press release is still appropriate).

4. Innoviva was required to issue new proxy materials with Sarissa's nominees on the Board's slate of nominees prior to Innoviva's 2017 Annual Meeting, and—if necessary—to adjourn the Annual Meeting (for no more than thirty days) to enable the preparation and issuance of those new materials.[272]

## C. Specific Enforcement of the Sarissa-Innoviva Settlement Agreement is Warranted.

"Specific performance is an equitable remedy designed to protect a party's expectations under a contract by compelling the other party to perform its agreed upon obligation."[273]  Specific performance is not granted as a matter of right "and its appropriateness rests in the sound discretion of the court."[274]  A party seeking specific performance must prove by clear and convincing evidence (1) the existence of a valid, enforceable contract; (2) the "essential elements" of that contract; and (3) the absence of an adequate legal remedy.[275]  The party seeking relief must also

---

[272] Given the evidence of the parties' negotiations and correspondence prior to Denner and Tyree's 2:30 PM Call on April 19, a reasonable negotiator in Denner's position would have understood that Innoviva agreed to take such actions.  *See, e.g.*, JX 149 (April 18 Sarissa Settlement Proposal Email); JX 164 (April 18 Skadden Draft Agreement).  Here again, I appreciate that changed circumstances may render this settlement term no longer feasible or practicable.

[273] *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 WL 3317551, at *12 (Del. Ch. Nov. 2, 2007), *aff'd*, 985 A.2d 391 (Del. 2009).

[274] *W. Willow-Bay Court*, 2007 WL 3317551, at *13.

[275] *See, e.g.*, *Osborn*, 991 A.2d at 1158; *Deene v. Peterman*, 2007 WL 2162570, at *5 (Del. Ch. July 12, 2007).

establish that it is "ready, willing and able to perform"[276] its contractual obligations, and that the "the 'balance of the equities' . . . favor[s] granting specific performance."[277]

Here, Sarissa has established by clear and convincing evidence the predicates for specific enforcement of the Sarissa-Innoviva Settlement Agreement. *First*, as discussed at length above, that Agreement is a valid, binding contract. *Second*, as discussed above, the essential elements of that contract are "clear and definite."[278] *Third*, Sarissa is without an adequate legal remedy, as no sum of money damages would fully compensate Sarissa for its loss of the opportunity to secure representation on Innoviva's Board.[279] *Fourth,* it is clear that Sarissa was ready, able and willing to perform its obligations under the Sarissa-Innoviva Settlement Agreement on April 19, 2017. Indeed, after the 2:30 PM Call on April 19, Denner immediately instructed Sarissa's team (and its proxy solicitor) to stop soliciting

---

[276] *Osborn*, 991 A.2d at 1158.

[277] *W. Willow-Bay Court*, 2007 WL 3317551, at *13.

[278] *M. F. v. F.*, 172 A.2d 274, 276 (Del. Ch. 1961) ("[A] party seeking specific performance must rest [its] case on an agreement which is clear and definite and in which there is no need for the Court to be asked to supply essential contractual elements[.]") (citation omitted).

[279] *See Collins v. Am. Int'l Gp., Inc.*, 1998 WL 227889, at *6 (Del. Ch. Apr. 29, 1998) ("The remedy of specific performance . . . 'is designed to take care of situations where the assessment of money damages is impracticable or somehow fails to do justice.'" (citation omitted)), *aff'd sub nom., Am. Int'l Gp. v. Collins*, 719 A.2d 947 (Del. 1998).

proxies "[b]ecause [Sarissa and Innoviva] have a deal"[280] and told DiPaolo to work with Innoviva's counsel to finalize the relevant documents (including the press release).[281] And the record reflects that DiPaolo did just that.[282] In addition, Sarissa, through its counsel, has manifested that it remains ready, willing and able to perform its obligations under the Sarissa-Innoviva Settlement Agreement going forward.[283]

*Finally*, the "balance of equities . . . favor[s] granting specific performance" here.[284] When Innoviva's Board met on April 19 from 1:30 PM to 1:47 PM, the Board expected that BlackRock would vote for "at least two of" Sarissa's director nominees, such that "at least two" of Sarissa's nominees would be elected to the Board to replace two incumbent directors.[285] At this juncture, the Board determined that it would be in the best interests of Innoviva's stockholders for Innoviva to settle with Sarissa on the terms that Denner (for Sarissa) and Tyree (for Innoviva)

---

[280] TT 48:3 (Denner).

[281] TT 47:19–48:3 (Denner).

[282] *See* TT 96:21–97:2, 98:3–99:10 (DiPaolo); TT 271:18–272:24, 297:15–300:22 (Grossman); JX 412 (Grossman Dep.) at 106:21–107:23; JX 255; JX 269; JX 274; JX 278.

[283] *See* D.I. 101 at 36:11–37:1; D.I. 129 at 43:1–2; 53:4.

[284] *W. Willow-Bay Court*, 2007 WL 3317551, at *13.

[285] JX 189 (April 19 Minutes: Morning-Afternoon) at 5.

ultimately agreed to during their 2:30 PM Call.[286] It then directed Tyree to get the deal done.

"Equity regards that as done which in good conscience ought to be done."[287] Innoviva's opportunistic maneuvers to escape its contractual obligations offend basic notions of equity. The only person acting with "good conscience" within Innoviva as relates to Sarissa was Tyree, and he was so offended by the manner in which the Board conducted its business that he resigned his position as vice chairman.

Given that the Sarissa-Innoviva Settlement Agreement was (and is) a valid, binding contract between Sarissa and Innoviva, Innoviva was not entitled to abandon that Agreement merely on account of BlackRock's vote.[288] With all of this said, on the scale that balances the equities here, Innoviva has nothing but misguided opportunism to place in its weighing pan.[289] The balance of equities clearly favors

---

[286] *See id.* at 5–8.

[287] *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983).

[288] *Trexler*, 166 A.3d 101 (TABLE) (While a party may come to "regret[] [its] decision to settle, 'our law does not relieve [it] of the burden of [that] decision[] simply because of [its] after-the-fact regrets. To do so would greatly undermine the utility of contracts . . . .'") (citation omitted). Moreover, allowing Innoviva to abandon that Agreement would "frustrate the important goal of committing to writing already-agreed-to settlements." *In re Lehman Bros. Hldgs. Inc.*, 2017 WL 3278933, at *2 (S.D.N.Y. Aug. 2, 2017).

[289] *See, e.g.*, *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009) ("A court of equity moves upon considerations of conscience, good faith, and reasonable diligence.").

Sarissa and, by extension, supports granting specific performance of the Sarissa-Innoviva Settlement Agreement.

Sarissa has established the predicates for specific performance. Accordingly, that is the remedy that must be granted to address Innoviva's breach of the Sarissa-Innoviva Settlement Agreement.

## III.   CONCLUSION

In an article for the Financial Times, investment banker and commentator, Frank Partnoy, writes that, in the spirit of deliberative decision-making:

> [W]e should generally delay the moment of decision until the last possible instant. If we have an hour, we should wait 59 minutes before responding. If we have a year, we should wait 364 days. Even if we have just half a second, we should wait as long as we can.[290]

Here, with the clock ticking, Innoviva waited to solve its impending electoral drubbing until the last possible moment, just before the votes were to be counted. When it sensed that a loss would be announced at any moment, it did what it thought it had to do to manage the risk and keep its incumbents on the Board—it deliberately struck a deal with Sarissa at the 59th minute. Its efforts to walk away from that deal, after discovering that the risk it thought it perceived was not real, will not be countenanced.

---

[290] Frank Partnoy, *Waiting Game: What Tennis Teaches Us*, Fin. Times, June 22, 2012, https://www.ft.com/content/4551e9ee-b9fd-11e1-937b-00144feabdc0 (last visited Dec. 6, 2017).

For the foregoing reasons, judgment will be entered in favor of Sarissa on its claim for breach of contract as follows: (1) a decree of specific performance ordering Innoviva to perform its obligations under the Sarissa-Innoviva Settlement Agreement; and (2) a declaratory judgment that Bickerstaff and Kostas are rightful members of the Innoviva Board pursuant to 8 *Del. C.* § 225. If there are other outstanding issues the Court needs to address before a final order and judgment can be entered, then the parties shall submit a joint letter to the Court within 10 days that identifies the issues and proposes a path forward. Otherwise, the parties shall meet and confer and submit a final order and judgment to implement these rulings, again within 10 days.